Orville CARTER, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–0001–CR–00041.

Supreme Court of Indiana.

Sept. 5, 2001.

Robert W. Hammerle, Joseph M. Cleary, Indianapolis, IN, Attorneys for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Orville Carter received a sixty-year prison sentence for molesting his autistic eight-year-old daughter. He claims that the child's word was not sufficient evidence. He also asserts that the trial court committed fundamental errors that rendered his trial unfair. We affirm.

### Facts and Procedural History

M.C. is a highly intelligent child who sometimes makes inappropriate comments because she is autistic. On May 25, 1999, M.C.'s mother Jessica Carter talked with her about subjects that are "personal" and not for public discussion.[1] M.C. asked if weather was personal, and Jessica said no.

M.C. then asked "if someone showing you their w[ie]nie was a personal thing." (R. at 140.)

M.C. went on to tell Jessica that Carter, M.C.'s father, came into her room one night and had M.C. touch his penis, then put it in her mouth. Jessica asked M.C. what that felt like, and M.C. replied that it felt like rubber.

Jessica told M.C. that other people would want to talk to her, and that M.C. should tell them the same story. She immediately sought advice at M.C.'s school, where she happened to encounter Dr. Robin Murphy, a psychologist specializing in autism who had worked with M.C. on three or four previous occasions. At the urging of school authorities, Jessica then took M.C. to the Family Advocacy Center for a videotaped interview with police officer Kathy Graban, where M.C. related the same story.

Officer Graban found it curious that M.C. "blurted out" her story unprompted. (R. at 183.) On Dr. Murphy's advice, she visited M.C. unannounced on June 4th to make sure that this spontaneity was the result of autism rather than coaching. M.C.'s story remained consistent.

The State charged Carter with child molesting, a class A felony, and with being an habitual offender.

M.C. was the first witness at trial. The prosecutor encountered difficulty immediately, when M.C. was unable to identify Carter in the courtroom.[2] She did elicit a

---

1. The conversation stemmed from a recent visit during which M.C.'s grandmother explained menstrual cycles to the child.

2. The following exchange took place:

Q. Is your dad in the courtroom?
A. Well, he must be.
Q. I want you to look over on that side of the room. Do you see your dad?
A. No.
Q. Look right over there. See the man with the striped shirt? Who is that man?
A. He doesn't seem to be my dad. It's not.
[Prosecutor]: Could you take your glasses off, please? (Request made of the Defendant)
DIRECT EXAMINATION RESUMED
Q. Does it look like your dad if he has his glasses off?
A. Well, he—are you my dad? Over there, are you?
Q. Can you see him from here?
A. I see him.

disjointed version of M.C.'s story.[3] M.C.'s responses then became so rambling and incoherent that the prosecutor concluded her direct examination.

On cross-examination, M.C. admitted that she did not remember Carter's attorney, whom she had met previously, and said, "I do get confused. I mostly forgot about you...." (R. at 133.) When asked "Do you get confused a lot with things that have happened?", M.C. acknowledged, "Yes." (*Id.*) She did reassert, however, that her father "went to jail because he—because he done something—touched my w[ie]nie ... He made me touch his w[ie]nie, I should say." (R. at 134.)

Jessica Carter testified next. On direct examination, she described what M.C. said about the molestation. On cross, defense counsel elicited the fact that three weeks after this disclosure, Jessica overheard M.C. talking to herself about a schoolmate who said that "if you put a w[ie]nie in your mouth it grows." (R. at 147.) Jessica questioned M.C. further, and asked her again about the incident involving Carter. According to Jessica, M.C. said that "daddy woke her up and then daddy pulled his big-boy shorts down...." (R. at 148.) Jessica pointed out to M.C. that "big-boy shorts" was their household term for briefs, which M.C.'s younger brother wore but her father did not. M.C. "looked a little confused and [ ] said, well, maybe it wasn't daddy." (R. at 149.)

Jessica also testified on cross-examination that M.C. is "[v]ery imaginative." (R. at 150.) She said that M.C. sometimes imagines things such as earthquakes and tornadoes that become very real in her mind.

The State next called Dr. Murphy as an expert witness. Officer Graban took the stand last and the State introduced M.C.'s videotaped May 25th interview. Officer Graban testified that M.C.'s story remained consistent on her June 4th unannounced visit.

Carter did not call any witnesses. The jury found him guilty of child molesting, and he pled guilty to being an habitual offender. The court entered a judgment of conviction and imposed a sixty-year sentence.

## I. The Evidence Was Sufficient

We neither reweigh evidence nor judge witness credibility when evaluating sufficiency claims. *Dinger v. State*, 540 N.E.2d 39 (Ind.1989). We look to the evidence and to the reasonable inferences from that evidence that support the ver-

---

Q.  Okay. Don't worry about that.
A.  Man—man with the striped shirt, are you my dad?
(R. at 130–31.)

3.  Q.  ... Do you remember why your dad went to jail?
A.  'Cause he touched my w[ie]nie.
Q.  Tell me about that.
A.  It wasn't a dream though, but he had truth that—I just don't want him to go to jail though.
Q.  I want you to tell me about him touching your w[ie]nie.
A.  Well,—
Q.  Where did that happen?
A.  At night—in my bedroom at night.
Q.  And how did it happen?

A.  And—[my brother]—he just told me to touch it—touch it with my hand first, then I touched it in my mouth.
Q.  What did it feel like?
A.  Rubber, to both.
Q.  To both?
A.  Yeah.
Q.  What did your dad say to you—when he asked you to touch it what did he say?
A.  Well, he told me not to tell. He said, don't—go touch my w[ie]nie, but tell mommy.
Q.  All right. Did you tell your mommy?
A.  Yes.
Q.  What did you tell your mommy?
A.  The same thing—things that happened. All the truth. I told her all the truth.
(R. at 131–32.)

dict. *Id.* We affirm if we find evidence of probative value from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Id.* at 39–40. A molested child's uncorroborated testimony is sufficient to sustain a conviction. *Id.* at 40.

Carter argues that the sole evidence against him, i.e. M.C.'s story,[4] was unreliable because M.C. could not identify her father in the courtroom and because, although she referred to her "dad" in most of her testimony, at one point she said, "And—[my brother]—he just told me to touch it...." (Appellant's Br. at 6; R. at 131.) He also cites Jessica's testimony that M.C. sometimes imagined things such as storms that became real in her mind, and that M.C. expressed uncertainty about her attacker's identity after she remembered that he wore briefs.

The problem Carter faces is that, with few exceptions, juries decide whether witnesses are to be believed. *Rodgers v. State*, 422 N.E.2d 1211, 1213 (Ind.1981). Carter invokes the "incredible dubiosity" rule, under which we may encroach upon this prerogative if a witness's testimony is inherently improbable or coerced, equivocal, or wholly uncorroborated. *Lott v. State*, 690 N.E.2d 204, 208 (Ind.1997)(citing *Gaddis v. State*, 253 Ind. 73, 251 N.E.2d 658 (1969)).

M.C.'s story is not inherently improbable. It is uncorroborated, but by its very nature child molestation often occurs without witnesses or physical evidence. As noted above, the fact that the only evidence is the child victim's statement does not require reversal. *Dinger*, 540 N.E.2d at 39–40.

Carter says that M.C. equivocated by making contradictory statements. The State counters by pointing out that M.C. told the same story four different times,[5] before and after the one time she expressed some uncertainty about her molester's identity. Furthermore, although M.C. failed to recognize Carter in the courtroom, she named her father as her attacker in all four statements, and Carter was undisputedly the only father figure in her life.[6]

Carter presents a close case, but the evidence was not so equivocal as to be incredibly dubious. "A conviction for rape can rest on the uncorroborated testimony of the victim even though there is equivocation or inconsistency in that testimony." *Peters v. State*, 542 N.E.2d 1340, 1342 (Ind.1989) (citation omitted). The same is true of molestation, and here a reasonable jury could have accepted M.C.'s four consistent accusations as true beyond a reasonable doubt.[7]

---

4. At oral argument, the State also cited Jessica's testimony that she found M.C.'s dirty underwear in Carter's dresser drawer after he was arrested. (R. at 145.) This fact was not linked to the incident charged, and does little to bolster the State's case.

5. To her mother on May 25, 1999; later that day in the videotaped interview; to Officer Graban ten days later; and at trial. (Appellee's Br. at 8.)

6. The State suggests that M.C. may have failed to recognize Carter because he changed his appearance by shaving off facial hair, changing his hairstyle, and/or dressing differently than he usually did. (Appellee's Br. at

8.) The record, however, contains no evidence to support this contention.

7. Carter also argues that the State did not sufficiently prove that the molestation occurred between July 10, 1998, and May 25, 1999, as alleged in the charge. (Appellant's Br. at 7.) Dr. Murphy testified that autistic children often lack a sequential sense of time. (R. at 167.) In her May 25th taped statement, M.C. thought the incident occurred around the end of winter or beginning of spring, after Christmas, when she was still eight. (State's Exh. 1.) This would have been during the time period alleged. At trial, M.C. twice said she forgot when the incident occurred, then said it happened a few days before her July 10th birthday, which would have fallen outside the

## II. No Fundamental Error

Carter claims that a number of errors, each discussed below, rendered his trial unfair. (Appellant's Br. at 1.) Carter has waived each of these claims unless they rise to the level of fundamental error.[8] *Helton v. State*, 539 N.E.2d 956, 957 (Ind.1989).

We recently re-emphasized the extremely narrow applicability of the fundamental error doctrine in *Taylor v. State*, 717 N.E.2d 90, 93–94 (Ind.1999). A fundamental error is "a substantial, blatant violation of basic principles of due process rendering the trial unfair to the defendant." *Id.* at 93. It applies only when the actual or potential harm "cannot be denied." *Id.* (citing *Ford v. State*, 704 N.E.2d 457, 461 (Ind.1998)). The error must be "so prejudicial to the rights of a defendant as to make a fair trial impossible." *Taylor*, 717 N.E.2d at 93 (quoting *Barany v. State*, 658 N.E.2d 60, 64 (Ind. 1995)). An appellate court receiving contentions of fundamental error need only expound upon those it thinks warrant relief. It is otherwise adequate to note that the claim has not been preserved.

Of Carter's six grievances, one presents a plausible claim for fundamental error and we examine it at length. The remaining claims are modest ones that do not warrant exception to the general rule requiring preservation of error.

*A. Expert Vouching.* Carter asserts that the court erred by permitting Dr. Murphy to testify that autistic children cannot lie. (Appellant's Br. at 9.) He claims that Dr. Murphy's testimony violated Ind. Evidence Rule 704(b): "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case;

---

time alleged. (Appellant's Br. at 7; R. at 134–35.)

Carter's argument fails in any event because in *Smith v. State*, 241 Ind. 1, 10, 168 N.E.2d 199, 203 (1960), we said:

[T]he offense must be proved to have been committed prior to the finding of the indictment, and ... the offense must be proved to have been committed within the time specified by the statute of limitations, and except where a special day is essential or where time is the essence of the offense, the time of the commission of the offense as averred in the indictment is not material, and the proof is not confined to the time charged.

(quoting Wharton's Crim. Evidence, 11th Ed., § 1039, pp. 1824–26). We held in *Barger v. State*, 587 N.E.2d 1304, 1307 (Ind.1992), that "time is not of the essence in the crime of child molesting." (Citations omitted.) We noted that children often forget specific dates, particularly in the common situation where the crime is not reported immediately. *Id.* An exact date is important only in situations such as those where a victim's age at the time the crime occurred falls near the dividing line between classes of offenses. *Id.* Here, Carter does not argue that the specific timing of the alleged crime was material, and the statute of limitations would not have run until M.C.'s thirty-first birthday. Ind.Code Ann. § 35–41–4–2(c) (West 1998).

8. All but the last of Carter's claims involve evidence or testimony to which his counsel did not object at trial. Defense counsel did argue at a pretrial hearing that M.C. was not a competent witness and that her videotaped interview should not be admitted at trial. (R. at 122; *see* sections B. and E. below.) However, a defendant must reassert his objection at trial contemporaneously with the introduction of the evidence to preserve the error for appeal. *Clausen v. State*, 622 N.E.2d 925, 927 (Ind.1993); *Hoover v. State*, 582 N.E.2d 403, 408 (Ind.Ct.App.1991) (adopted and incorporated by reference in *Hoover v. State*, 589 N.E.2d 243 (Ind.1992)) (videotaped statement admitted without objection during child molestation trial; "[f]ailure to object at trial when the evidence is offered results in waiver of the alleged error even where the defendant has made a pre-trial motion to suppress the evidence.")

As discussed in detail in section F. below, Carter's final claim is waived because he failed to make an offer of proof. He must therefore show fundamental error on this claim as well, to be entitled to relief.

the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

■ In this case, the special problems that arise when a child accuses a family member of molestation were compounded by M.C.'s autism. We expect jurors to draw upon their own personal knowledge and experience in assessing credibility and deciding guilt or innocence. *See Lamar v. State*, 514 N.E.2d 1269 (Ind.1987). When they are faced with evidence that falls outside common experience, we allow specialists to supplement the jurors' insight. Indiana Evidence Rule 702(a) says: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Dr. Murphy described her prior contacts with M.C. as very sporadic and said that she had not seen M.C. since the prior year. She testified that autistic children generally "have a very, very difficult time manipulating what's in someone's mind," i.e., deliberately deceiving others. (R. at 159.) She substantiated this conclusion by describing a study in which autistic children could follow an instruction to lock a box to prevent a "thief" from taking the candy inside, but could not lie on command and tell the "thief" that there was no candy in the box. (R. at 158–59.) Although Dr. Murphy did not at any point directly state an opinion that M.C. was telling the truth, the jury could easily have drawn a logical inference: autistic children do not deliberately lie, M.C. is autistic, therefore M.C. is not lying.

On cross-examination, defense counsel attacked this inference by probing further into whether autistic children are capable of relating events that did not actually happen. Dr. Murphy testified that autistic children lack imagination. She said, "I've never had a child with autism lie to me about what actually occurred. That's not to say that they absolutely will never lie. But, when they do, they tend to be very poor liars." (R. at 165.) But she did concede, "I never talk in absolutes. I would never say that absolutely every child with autism absolutely has no imagination and is incapable of making up something that didn't happen." (R. at 166–67.) On re-cross, she testified that autistic people might associate occurrences with no relationship to each other and "put them together into an event." (R. at 171–72).

At this point the jury could have logically concluded that M.C. was not deliberately lying about the molestation, but had confused different events and offered an inaccurate account of what happened. M.C. herself demonstrated that this could happen. In her videotaped statement, she described with apparent sincerity how it rained the day she told her mother about the molestation, and how she used an umbrella for five minutes. Jessica Carter testified that it was sunny that day. Carter's attorney referred to this inconsistency when cross-examining Dr. Murphy:

Q. Would you be surprised if a child reported, when she was sitting on a blanket, that it was raining when in fact it never rained that day?

A. I'd figure that there was a leak in the ceiling or something—from the pipes. I mean, I just don't think that— something happened that made that association in her mind.

Q. Do you think an autistic child is capable of doing just that?

A. That's what I'm trying to say. I mean, this is one of the characteristics of children with autism . . . .

(R. at 166.)

In summary, we conclude based on the entire context of the expert's testimony

that she came close to, but did not cross the line into impermissible Rule 704(b) vouching. Although her statements that autistic children find it difficult to deliberately deceive others may have been persuasive, the jury still had to draw its own inference as to whether M.C.'s story was an accurate account.

B. *M.C.'s Videotaped Statement.* Carter argues that M.C.'s videotaped statement was unreliable because upon first hearing M.C.'s story Jessica told M.C. that other people would want to talk to her and she should tell them the same story. (Appellant's Br. at 5.) He claims this is coaching, but did not preserve any claim during trial.

C. *Hearsay Evidence of M.C.'s Story.* Carter asserts that Jessica Carter and Officer Graban impermissibly bolstered M.C.'s credibility by repeating at trial what M.C. told them about the molestation. (Appellant's Br. at 4.) Indiana's "protected persons" statute makes certain hearsay statements of children under age fourteen and certain mentally disabled persons admissible in sex crime cases. Ind.Code Ann. § 35–37–4–6 (West 1993 & Supp.1994).

After a hearing required by statute, the court found M.C.'s statements to Jessica reliable and it gave the requisite jury instruction immediately after Jessica repeated M.C.'s statements at trial. *Id.* at § 6(d)(1), (g); (R. at 106–12, 123).

Carter did not object at trial to this testimony.

D. *An Alias on the Charging Information.* The charging information that went to the jury room along with the instructions showed the alias "a/k/a Arvine E. Durham" after Carter's name.[9] He claims that this created an unfair inference of previous criminal activity, (Appellant's Br. at 4), but did not object at trial.

E. *M.C.'s Competency as a Witness.* Carter argues that M.C. was not a competent witness because the record does not show that she knew what an oath meant and that she was compelled to tell the truth. (Appellant's Br. at 5.)

At the pre-trial hearing, M.C. asserted that she "tell[s] the most truth ever" before she was asked the first question. (R. at 119.) The prosecutor then asked M.C. if it would be the truth or a lie if she said that her (white) suit was black, and M.C. correctly identified the lie. When asked "Is it important to tell the truth?", M.C. said yes, "[b]ecause you don't want people to end up in jail. Who lied has to—who lies would get the wrong person into jail." (R. at 120.) No objection was lodged.

F. *Limits on Jessica's Cross Examination.* Carter claims the court violated his right to confront and cross-examine Jessica Carter by sustaining the State's objections to various questions his lawyer asked her on cross-examination. (Appellant's Br. at 22–24.)

Carter's counsel did not make any offers of proof. In 1994, we adopted Ind. Evidence Rule 103(a)(2):

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one excluding evidence, the substance of the evidence was made known by a proper offer of proof, or was apparent from the context within which questions were asked.

G. *All Things Considered.* At the end of the day, we cannot conclude that these defects amounted to a substantial, blatant

9. At sentencing, Carter's attorney explained that the alias became part of Carter's records when Carter was arrested on an unrelated prior charge and had the name of his half-brother in his wallet.

violation of due process, the test for ordering reversal.

### Conclusion

We affirm Carter's conviction and sixty-year sentence.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.