Ronnie G. **MILLER**, Defendant–Appellant,

v.

**STATE of Indiana, Plaintiff–Appellee.**

No. 49S00–9908–CR–445.

Supreme Court of Indiana.

June 26, 2002.

Ann M. Sutton, Marion County Deputy Public Defender, Indianapolis, IN, Attorney for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry,

Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

DICKSON, Justice.

The defendant, Ronnie G. Miller, was convicted of murder and criminal deviate conduct in the 1995 death of 71–year–old Anna Pennington,[2] who was beaten, sexually attacked, and strangled to death in her office where she managed an Indianapolis residence converted into eight apartments. The State had sought the death penalty but the trial court dismissed the death penalty count before trial because it found the defendant to be mentally retarded.[3] Following the jury's verdict, the defendant was sentenced to sixty-five years for murder and twenty years for criminal deviate conduct, with the sentences to be served consecutively. In this appeal, we address the following claimed trial court errors: (1) admitting his statement that police obtained by coercion and manipulation; (2) excluding the testimony of a social psychological expert in coerced confessions; (3) convicting him on insufficient evidence. Concluding that the exclusion of expert testimony was reversible error, we reverse and remand for new trial.

## 1. Voluntariness of Statement

The defendant contends that his statement to the police should have been suppressed because it was the result of coercion, manipulation, and fabricated evidence, in combination with his vulnerable mental state. The defendant argues that the "totality of the circumstances creates a full picture of the unwitting mentally retarded defendant being led down the path to his own detriment, the path being paved by lies and coercion." Br. of Appellant at 17.

Prior to trial, the defendant filed a motion to suppress "the statement of the defendant made during the interrogation of the defendant on August 6–7, 1995." Record at 266. The defendant's extensive supporting brief requested the court to "suppress the entirety of his statements made on August 6 and August 7, 1995 to Det. Craig Converse." Record at 309. The trial court denied the motion. During trial, when the State was questioning Detective Converse regarding his preliminary interview of the defendant before the videotaped interview, the defense objected, expressly referring to its objections previously presented. Record at 2320, 2323. When the State offered the videotape and its transcript into evidence, the defendant objected "based on reasons made previously known to the Court, and incorporat[ing] by reference prior hearings and argument in support of the objection." Record at 2375. The objections were denied. The

---

**2.** The jury found the defendant guilty of separate charges of murder and felony murder. At sentencing the trial court merged the felony murder count into the murder conviction.

**3.** The State may not seek the death penalty against a mentally retarded individual. Ind. Code § 35–36–9–6. For this purpose, "mentally retarded individual" is defined as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) [s]ignificantly subaverage intellectual functioning; and (2) [s]ubstantial impairment of adaptive behavior; that is documented in a court ordered evaluative report." Ind.Code § 35–36–9–2. After a hearing and consideration of the opinions of several expert witnesses, the trial court found that significant subaverage intellectual functioning "equates with an IQ of approximately 70 to 75 or below...." Record at 264A. The court dismissed the State's request for the death sentence, concluding that the defendant "has significantly subaverage intellectual functioning in that experts trained in the field of intelligence testing administered traditional standardized tests to him and concluded that his intellectual functioning was at 67 [which] confirms measurements taken of him in grade school prior to the age of twenty-two (22) years." *Id.*

grounds asserted in this appeal were timely raised at trial.

 The decision to admit the defendant's statements is a matter of discretion of the trial court after considering the totality of the circumstances. *Kahlenbeck v. State*, 719 N.E.2d 1213, 1216 (Ind.1999). "When reviewing a challenge to the trial court's decision, we do not reweigh the evidence but instead examine the record for substantial, probative evidence of voluntariness." *Schmitt v. State*, 730 N.E.2d 147, 148 (Ind.2000); *see also Horan v. State*, 682 N.E.2d 502, 510 (Ind.1997). It is the State's burden to prove "beyond a reasonable doubt that the defendant voluntarily waived his rights, and that the defendant's confession was voluntarily given." *Schmitt*, 730 N.E.2d at 148.[4] In looking at the totality of the circumstances from all the evidence, many factors may be considered including:

> the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986); the length of the interrogation, *Ashcraft v. Tennessee*, 322 U.S. 143, 153–54, 64 S.Ct. 921, 926–27, 88 L.Ed. 1192, 1199 (1944); its location, *see Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546–47, 6 L.Ed.2d 948, 954 (1961); its

continuity, *Leyra v. Denno*, 347 U.S. 556, 561, 74 S.Ct. 716, 719, 98 L.Ed. 948, 952 (1954); the defendant's maturity, *Haley v. Ohio*, 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–04, 92 L.Ed. 224, 228 (1948) (opinion of Douglas, J.); education, *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423, 428 (1967); physical condition, *Greenwald v. Wisconsin*, 390 U.S. 519, 520–21, 88 S.Ct. 1152, 1153–54, 20 L.Ed.2d 77, 79–80 (1968) (per curiam); and mental health, *Fikes v. Alabama*, 352 U.S. 191, 196, 77 S.Ct. 281, 284, 1 L.Ed.2d 246, 250 (1957).

*Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407, 420 (1993); *see also Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684, 693 (1969) (considering duration, maturity, intelligence, police deception, and rights communicated to defendant); *Light v. State*, 547 N.E.2d 1073, 1077–79 (Ind.1989) (considering duration, education and intelligence, and police conduct); *Kahlenbeck*, 719 N.E.2d at 1216–17 (considering duration, maturity, intelligence, intoxication, advisement of rights, and police deception); *Carter v. State*, 490 N.E.2d 288, 290–91 (Ind.1986) (considering advisement of rights, maturity, intelligence, and length of interrogation).[5] We

---

4. Indiana courts require the State to prove the voluntariness of a confession beyond a reasonable doubt, unlike federal decisions, which require only proof by a preponderance of the evidence. *See Henry v. State*, 738 N.E.2d 663, 664 n. 1 (Ind.2000).

5. In regard to police conduct, we note that police deception does not automatically render a confession inadmissible. *Kahlenbeck*, 719 N.E.2d at 1217. We have repeatedly stated that police deception during an interview is one factor to consider in the totality of the circumstances. *Id.* (citing *Willey v. State*, 712 N.E.2d 434, 441 (Ind.1999)) (finding that the admitted police deception of falsely claiming possessing certain evidence during interrogation did not render the defendant's state-

ment involuntary when the defendant had been read his rights, indicated that he understood them, was a mature individual of normal intelligence and had not been interrogated for an inordinate amount of time); *see also Carter*, 490 N.E.2d at 290–91 (finding the defendant's statement voluntary even though police falsely told the defendant that the victim was still alive because the defendant had been apprised of his rights, indicated he understood, was a mature individual of normal intelligence, and was not interrogated for an inordinate amount of time). We also note that not all police interrogation statements of conjecture, presented as fact, constitute police deception. *See Ellis v. State*, 707 N.E.2d 797, 801 (Ind.1999). In *Ellis*, we determined that

must determine, in light of the totality of circumstances, whether the police conduct overbore the defendant's will, thus rendering his statement involuntary. *Henry v. State*, 738 N.E.2d 663, 665 (Ind.2000).

The evidence indicates that, after being told by friends that the local television news broadcast his name in connection with a recent murder, the defendant voluntarily went to the police station to "get it cleared up." Record at 2203. The defendant arrived at 5:30 p.m. and was placed in an interview room and the door was closed. The interview room door automatically locks from the outside when closed. The detective on duty periodically checked on the defendant to see if he needed anything. The defendant was not formally arrested at this time. After the defendant had waited approximately two hours, Indianapolis Police Detective Craig Converse, who was assigned to the case, arrived and began talking to the defendant.

For about one hour, Detective Converse gathered background and preliminary information from the defendant. When the defendant initially denied being at the apartment house where the victim was murdered, which was contrary to the information developed in the police investigation, Detective Converse considered the defendant to be a suspect and orally informed the defendant of his rights. No waiver of rights was signed at this time. Detective Converse's ensuing questioning became more focused and included confronting the defendant with speculation and assertions that misstated or exaggerated information known to the detective. Specifically, Detective Converse told the

defendant that witnesses had seen the defendant in the hallway outside the victim's first floor office. But Detective Converse only knew that a witness saw the defendant in the upstairs hallway, and that no witness had stated that the defendant was seen outside the first floor office. In the course of further interrogation, Detective Converse presented the defendant with a fabricated fingerprint card and computer printout and represented that the defendant's fingerprints had been found in the victim's office. In fact, while fingerprints had been recovered at the scene, they had not yet been identified at the time of the interrogation. Detective Converse also showed the defendant the police report that stated that the victim died of natural causes. Detective Converse, knowing that the report was erroneous, nevertheless suggested to the defendant that the death could have been an accident. During the entire period of questioning, the defendant was given breaks for drinks, snacks, and to use the restroom. Just before 1:00 a.m., the defendant acknowledged that he had encountered the victim in her office on the night of her death, that he pushed open the door to her office, she told him to "Get the hell out," and that she then backed up, started to fall, and that he reached out and the subsequent injuries happened. Record at 2369.

At this point, about 1:00 a.m., Detective Converse and the defendant took a 45–minute break, during which time the defendant was provided with a soda and the opportunity to use the rest room. He then was left alone in the room until approximately 1:45 a.m., when Detective Converse

---

if the police have a good faith basis for their technical falsehood, then their action will not be deemed deceptive. *Id.* (where police had observed footprints at the crime scene, telling the suspect during interrogation that they had evidence of a shoe print which would be

similar to his was not deceptive even though they had no actual evidence, and threatening to arrest suspect's brother and sister if suspect did not cooperate was not deceptive when suspect's siblings were already in custody).

informed the defendant that he was under arrest and that Detective Converse wanted "to put this on tape," to which the defendant responded "okay." Record at 2371.

At the beginning of the videotaped interview, Detective Converse again advised the defendant of his rights, one by one, and after reading each, asked the defendant if he understood it. As to each right, the defendant acknowledged his understanding. In response to the detective's concluding question "What does it mean to you when I tell you your rights?" the defendant responded, "It means that if I didn't want to, you know, say anything, that I can talk to an attorney or I could, you know, come on with (inaudible) you know, to get this cleared up." Record at 2381. After then reminding the defendant that he was under arrest and charged with murder, Detective Converse questioned the defendant about the incident. In the ensuing videotaped interview the defendant admitted that, on the day of the killing, he entered the apartment house intending to contact an acquaintance. He entered the structure and knocked on his friend's first floor apartment door. Getting no response, he turned and saw the victim standing in her office door and then closing the door. The defendant then went upstairs to contact another person and, upon his return downstairs to leave the building, he saw the office door again closing. Believing that the victim was trying to overhear his conversations, the defendant pushed open the office door, and the victim said, "Get out of here." Record at 2394. He offered the following description of the occurrence to Detective Converse:

> She was standing there, she said, "Get out of here," and started to go back the other way and she was falling and when I, I guess I was trying to keep her from falling and my hand reaction of my hand touched her face and then my chin hit

her either when she was going down I was trying to catch her and my fingers must have hit her face and, you know, . . . . damn.

Record at 2395. The defendant then stated that he didn't push her, but that as she went down, she pulled him down and his face fell on top of her, and he hit her with his chin or his head. When Detective Converse told the defendant that when the police arrived, the victim's pants were pulled down and that an autopsy indicated that there was penetration in her vagina, indicating that she was raped, the defendant responded, "Well, she wasn't raped by me, sir. I wouldn't, you know, do nothing like that to no older lady." Record at 2407–08. Shortly thereafter, at approximately 2:35 a.m., the interview was terminated at the request of the defendant who indicated that he wanted to talk to an attorney. Record at 1188. At no time during the videotaped portion of the interview did Detective Converse use or refer to any of the speculation, misstatements, or exaggerated information that he asserted during the questioning that preceded the videotaped interview.

At the time of his interrogation, the defendant was forty-years-old and employed, he spoke normally, he did not appear to be incoherent or under the influence of alcohol or drugs. Record at 1162–63, 1325. There is no allegation or indication that police knew that he was mentally retarded. The defendant's prior criminal history evidences his familiarity with the criminal justice system. Record at 1354–56. He was twice orally advised of his rights prior to his videotaped statement, and once again at the commencement of his videotaped statement, which advisement he acknowledged and expressly waived. He further demonstrated his awareness of rights when he later requested that the interview stop because he wanted to talk to an attorney.

The trial court denied the motion to suppress, expressly noting its earlier determination that the defendant was mentally retarded, but finding that he freely, voluntarily, and intelligently waived his rights and gave his statement to police.[6]

The police interrogation facts are strikingly similar to those in *Henry*, in which the officers falsely told Henry that his fingerprints were found at the scene of the crime and that a witness identified him as the person who killed the victim. 738 N.E.2d at 664. In addition, "Henry actually gave two incriminating statements: the first, unrecorded and accompanied by police deceit; the second, audiotaped with no hint of police deception. It was the second audiotaped confession that was admitted into evidence." *Id.* at 665. In *Henry*, we found no error in the admission of the confession.

Similarly here, considering the totality of the substantial probative evidence of voluntariness shown by the record, we find beyond a reasonable doubt that the defendant voluntarily waived his rights, and that his incriminatory statements admitted in evidence were voluntarily given. The trial court did not err in denying the defendant's motion to suppress and overruling his trial objections to the admission of his statements in evidence.

## 2. Exclusion of Testimony of Defendant's Expert

The defendant contends that the trial court erroneously excluded the testimony of Dr. Richard Ofshe, a psychologist called by the defense as an expert in the field of "social psychology of police interrogation and false confessions." Br. of Appellant at 17.

On the first day of trial, the State filed a motion in limine seeking an order prohibiting the defendant's expert and lay witnesses from testifying about various matters, including "the interrogation process used in this defendant's case," and "the truthfulness of the defendant's statements/confession given in this case." Record at 408. Following a brief discussion with counsel, the trial court stated that it would preliminarily grant the motion as to all witnesses, but that when the defense's expert witness arrived, the court would hear the expert's testimony out of the jury's presence, reconsider the motion, and rule on it. Record at 1411–12.

The motion was then reconsidered near the end of the evidence. Out of the jury's presence, the defense questioned Dr. Ofshe regarding the matters it sought to have Dr. Ofshe present to the jury. When the trial court, during the testimony of Dr. Ofshe, expressed concern that his testimony would imply by innuendo that Detective Converse's interrogation of the defendant produced a coerced confession, Record at 2830–31, Dr. Ofshe explained:

> The nature of the testimony is going to be: one, about the general way in which police interrogation works which fits the

---

**6.** The trial court entered the following findings in denying the defendant's motion to suppress:

> 3. Although this Court has found that Mr. Miller is a mentally retarded person pursuant to I.C. 35–36–9–5, the Court finds that he understood all of his legal rights as described to him and that he freely, voluntarily and intelligently waived his rights and gave the police a statement.

> 4. Det. Converse's deceit to Mr. Miller regarding the nature of the evidence in the detective's possession which occurred after the reading of the "Miranda" warnings does not amount to improper coercion which would negate Mr. Miller's free will giving the statement.

Record at 342.

description that Converse gave about the tactics that he used; second, it will be about those things that can lead to someone giving a false confession; and third, it will be about how to take the undisputed record of the interrogation, the recorded part of it and analyze it, in terms of trying to figure out what is—what the indicia of a true or false confession might be—and thereby for the jurors to reach their decision about how much weight to give it. My role is only to point out what things ought to be considered.

Record at 2831–32. The defense then called Detective Converse to the stand and questioned him about the defendant's interrogation, and then recalled Dr. Ofshe, asking him whether Detective Converse's testimony provided "any characteristics ... or phenomena of false confessions or police interrogation in your area of study...." Record at 2865. Dr. Ofshe replied:

He identified the two principle things that go into the analysis of police interrogation.... First, he talks about the use of the fingerprints, for example. That's what I refer to in my writings as an evidence ploy, bringing before someone information that contradicts what they have previously been saying, that places them in involvement at a the crime scene, whether that evidence is true or that evidence is false, it is what—what I refer to as an evidence ploy, so as not to restrict it to whether it's true or false. It's an evidence ploy because it's used tactically. It is used tactically in order to move the person off the position that they had previously been maintaining by showing them that it's hopeless to maintain that you aren't involved in this. And the use of evidence ploys is the principal way in which someone who is—initially says, "I didn't do it; I wasn't there" is gotten to recog-

nize that it's hopeless to maintain that position, and that's crucial to understanding how it is you get someone to say, "Okay, I did it." The second thing that Converse described was the use of his pointing out that this was just a natural death and he used the word "accident" in that. That's again a motivational tactic. The object is to make the suspect believe that the police officer is willing to believe a characterization of what happened that is less heinous, less morally reprehensible and also carries the implication of—of a less serious and perhaps even borderline or perhaps even carrying no punishment uh—for having committed the acts because it's sometimes characterized as self-defense, for example. So Converse has already illustrated the two principal components of · modern police interrogation. The other things uh—I'm also aware that he acknowledges he was friendly. He tried to develop rapport. He tries to—to tell Mr. Miller that he only wants to get to the truth and he confronts Mr. Miller when he believes or knows that Mr. Miller is lying with evidence ploys designed to move him in the direction of admitting that he was there.

Record at 2865–67. After the evidence on the motion was completed, the trial court concluded that there was no dispute in the evidence regarding "the officer's interrogation," Record at 2869, and expressed concern that the witness's testimony would be "questioning the truth and veracity of a witness, ... the police officer," Record at 2870. It ruled, "I'm not going to permit the testimony for that reason." *Id.* The defendant supplemented the hearing on the State's motion in limine with an offer to prove. Record at 2903–3147. This offer included further testimony from Dr. Ofshe regarding his expertise and extensive writings in the area of po-

lice interrogation and false confession and a description of modern police interrogation technique. Dr. Ofshe described evidence ploys based on psychological principals used to "drive [a suspect's] confidence down to the point where they think it is virtually certain" that they will be arrested, tried, and convicted. Record at 2911. He also explained the tactic of "maximization/minimization" or "the accident strategy" which is "intended to make it easier for the person to say 'I did it.'" Record at 2913–15. Dr. Ofshe then stated that "police are trained to try to get corroboration in the post-admission narrative," explaining the efforts to obtain details from the suspect that are consistent with the known facts of the crime. Record at 2916. Dr. Ofshe testified, "There are innumerable demonstrated cases of people confessing to crimes, being convicted, and subsequently being exonerated." Record at 2928. He also asserted that the "mentally handicapped are more suggestible and more likely to give a false confession," stating that they are "easier to manipulate," less able to appreciate long-range consequences, easier to persuade to see the facts as asserted by the interrogator, and easier "to get to give both true and false confessions." Record at 2928–29.

Because the trial court did not reverse his earlier ruling, Dr. Ofshe did not present any testimony to the jury.

The defendant argues on appeal that, notwithstanding the trial court's finding that there was no factual dispute regarding the interrogating officer's techniques, "there was nothing to explain to the jury why someone, confronted with lies, would then falsely admit to a crime." Br. of Appellant at 10. The defendant urges that even when a trial court determines a defendant's statement to be sufficiently voluntary for admission in evidence, the defendant may still dispute its voluntariness

to the jury. He asserts that "[t]he interrogation process, including its psychological ramifications, is not within the common knowledge of ordinary persons." Br. of Appellant at 18. Acknowledging that there is no evidentiary dispute regarding whether Detective Converse confronted the defendant with speculation and assertions that misstated or exaggerated information known to police, the defendant argues that he was entitled to present expert testimony regarding the psychology of false confessions that would enable the jury to understand why the mentally retarded defendant "would succumb to the lies" even though he was innocent. Br. of Appellant at 19.

The State argues that the court properly excluded the testimony because the facts of the interrogation were not in dispute and because the jury would understand the expert's testimony to pertain to Det. Converse's interrogation of the defendant in this case. In the alternative, the State argues that the exclusion of the proffered evidence was harmless.

 We first observe that a trial court's determination that a defendant's statement was voluntary and admissible does not preclude the defense from challenging its weight and credibility.

[T]he trial court must make a preliminary factual determination of voluntariness when assessing the statement's admissibility. The jury, however, remains the final arbiter of all factual issues under Article 1, Section 19 of the Indiana Constitution. Even if the court preliminarily determines that the statement is voluntary and admits it for the jury's consideration, then the defendant is still entitled to dispute the voluntariness of the statement once it is presented to the jury. Although the court has previously determined voluntariness in connection with the statement's admissibility, the

jury may find that the statement was involuntarily given. If the jury makes such a determination, then it should give the statement no weight in deciding the defendant's guilt or innocence.

*Morgan v. State*, 648 N.E.2d 1164, 1170 (Ind.Ct.App.1995) (The discussion of this issue by the opinion of the Court of Appeals was expressly approved and adopted in *Morgan v. State*, 675 N.E.2d 1067, 1072 (Ind.1996).). Expert testimony is appropriate when it addresses issues not within the common knowledge and experience of ordinary persons and would aid the jury. Ind.Evidence Rule 702(a). "When [jurors] are faced with evidence that falls outside common experience, we allow specialists to supplement the jurors' insight." *Carter v. State*, 754 N.E.2d 877, 882 (Ind.2001) (finding experts may not testify, however, "to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Evid.R. 704(b)). "We expect jurors to draw upon their own personal knowledge and experience in assessing credibility and deciding guilt or innocence." *Carter*, 754 N.E.2d at 882. In *Carter*, we held that a psychologist's testimony that autistic children find it difficult to deceive "came close to, but did not cross the line into impermissible Rule 704(b) vouching." *Id.* at 883–84.

The testimony of Dr. Ofshe regarding police interrogation was also at issue in *Callis v. State*, 684 N.E.2d 233 (Ind.Ct.App.1997), in which the trial court issued a pre-trial order limiting his testimony regarding the circumstances of the defendant's police statements by prohibiting him from testifying as "to the defendant's intent, guilt or innocence, or the truth or falsity of whether a witness has testified truthfully, or to legal conclusions." *Id.* at 239. At the trial of Callis, Dr. Ofshe testified without objection about false confessions generally, but the trial court sustained the State's objection when he was asked his opinion about the interrogation process in Callis's case. In Callis's offer of proof, Dr. Ofshe testified that "there was a 'great dispute between the accounts' of Callis and the witnessing officers, that 'we have three different versions of an inculpatory statement . . . all of which are denied by Mr. Callis,' and that '[s]omeone is telling the truth and someone is lying, and there's no way to reconcile those two things.'" *Id.* (citations omitted). The Court of Appeals affirmed the trial court's ruling, stating:

> We conclude that the trial court properly admitted Ofshe's testimony regarding the phenomenon of coerced confessions and properly excluded his opinion about Callis's interrogation. As can be seen in Callis's offer of proof, the aim of Ofshe's excluded testimony was to express an opinion as to which witness was telling the truth about Callis's statements. Such testimony is not admissible pursuant to Evid. R. 704(b).

684 N.E.2d at 239–40. We understand *Callis* to prohibit expert opinion testimony regarding the truth or falsity of one or more witnesses' testimony, but it does not generally prohibit expert testimony regarding police techniques used in a particular interrogation.

In the present case, the fact that the content of the interrogation was not in dispute is not a proper basis on which to exclude Dr. Ofshe's testimony. The defendant's trial strategy clearly included his challenge to the voluntariness of the incriminatory statements in his videotaped police interview. The trial court's threshold determination of sufficient voluntariness for admissibility of the videotape did not preclude the defendant's challenge to its weight and credibility at trial. From

our review of the circumstances in the present case, the general substance of Dr. Ofshe's testimony would have assisted the jury regarding the psychology of relevant aspects of police interrogation and the interrogation of mentally retarded persons, topics outside common knowledge and experience. In the event that some of Dr. Ofshe's testimony to the jury would have invaded Rule 704(b)'s prohibition of opinion testimony as to the truth or falsity of the defendant's statements, the trial court could have sustained individualized objections at trial. We hold that excluding the proffered expert testimony in its entirety deprived the defendant of the opportunity to present a defense.

The State argues that the exclusion of Dr. Ofshe's testimony was harmless because the defendant's presence in the victim's office was established by evidence that his fingerprint was found in what appeared to be blood on a plastic bag at the scene. This is not inconsequential evidence. We note, however, that during final argument the State placed great emphasis upon the defendant's videotaped statements, including replaying part of the videotape to the jury and directing the jury's attention to a point during the videotape where "the defendant puts his hands up to Detective Converse's head and shows you how he strangled Anna Pennington." Record at 3187. Given the prominence of the defendant's statement in the State's case and the unique circumstances present, we find that the erroneous exclusion of the whole of Dr. Ofshe's testimony affected the substantial rights of the defendant. The defendant is entitled to a new trial.[7]

### 3. Insufficiency of the Evidence

The defendant contends that the evidence at trial is insufficient to support either of his convictions.[8]

In addressing a claim of insufficient evidence, an appellate court must consider only the probative evidence and reasonable inferences supporting the judgment, without weighing evidence or assessing witness credibility, and determine therefrom whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Marcum v. State,* 725 N.E.2d 852, 863 (Ind.2000).

The petite 71–year–old victim suffered multiple blunt force injuries to the head and neck and died from manual strangulation. The victim's pants were pulled down and the autopsy revealed evidence of sexual assault in the form of injuries to the vagina. The defendant was identified as being at the apartment house shortly before the victim was found. The defendant's statement to police admitted his presence at the murder scene near the time of the crimes, his anger at the victim for eavesdropping on his conversations, his entry into the victim's office despite her telling him to leave, and his physical contact with her and her falling to the floor with him on top of her. Further, the defendant's fingerprint was found at the scene of the murder.

The defendant maintains that the testimony of the resident identifying him as present in the apartment building was in-

---

7. Because of this result, we do not address the defendant's claim of trial error in the admission of hearsay evidence from a deceased person.

8. We review this claim because, if the evidence is found to be insufficient to convict the defendant, he is entitled to have his convictions reversed, and he could not be retried. *See Stahl v. State,* 686 N.E.2d 89, 94 (Ind. 1997); *Vest v. State,* 621 N.E.2d 1094, 1096–97 (Ind.1993).

consistent and suspicious. The inconsistencies in the testimony were brought out at trial and were factual issues for the jury to resolve. Challenging the probative value of the matching fingerprint fount at the scene, the defendant argues that the fingerprint was initially determined to be insufficient for comparison but through additional testing was identified as the defendant's; that the police department's policy of requiring only seven of a potential 150 characteristics and the fact that the print matched eight of the characteristics is insufficient evidence of a match; that while eleven prints were lifted from the scene, only the defendant's and the victim's prints were ordered to be compared to the crime scene prints; and that the other ten prints discovered were not identified. These facts and issues were raised at trial for consideration by the jury.

We conclude that from the evidence presented a reasonable jury could find the defendant guilty of the charged offenses beyond a reasonable doubt.

### Conclusion

The judgment of the trial court is reversed and this case is remanded for a new trial or further proceedings consistent with this opinion.

SHEPARD, C.J., and SULLIVAN and RUCKER, JJ., concur.

BOEHM, J., concurs with separate opinion.

BOEHM, Justice, concurring.

I concur in the majority opinion. I write separately to note that the admissibility of Dr. Ofshe's testimony under Indiana Evidence Rule 702 was not addressed by Miller or the State. Jurisdictions that have considered the admissibility of expert testimony as to false confessions under various versions of Evidence Rule 702 have split on that issue. *Compare United States v. Shay*, 57 F.3d 126 (1st Cir.1995); *United States v. Hall*, 974 F.Supp. 1198 (C.D.Ill.1997); *Boyer v. Florida*, —— So.2d ——, 2002 WL 925015 (Fla.Dist.Ct.App. May 9, 2002) *with People v. Son*, 79 Cal.App.4th 224, 93 Cal.Rptr.2d 871 (2000); *Kansas v. Cobb*, 43 P.3d 855 (Kan.Ct.App.2002); *New Jersey v. Free*, 351 N.J.Super. 203, 798 A.2d 83 (App.Div.2002).