## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 16 2019, 9:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kareem Jahbbar Williams,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 16, 2019

Court of Appeals Case No.
18A-CR-2158

Appeal from the Lake Superior
Court

The Honorable Samuel L. Cappas,
Judge

Trial Court Cause No.
45G04-1604-MR-6

**Crone, Judge.**

# Case Summary

Kareem Jahbbar Williams appeals his convictions for murder, level 6 felony altering the scene of a death, level 6 felony auto theft, level 6 felony mutilating a corpse, and level 6 felony fraud. He argues that the trial court abused its discretion in admitting his confession. Finding no abuse of discretion, we affirm.

# Facts and Procedural History

In the early morning hours of April 12, 2016, Williams was involved in a verbal and physical altercation with Diamond Lewis regarding the paternity of their infant child ("Child") at Lewis's Merrillville apartment. Child was also present somewhere in the apartment. As Williams and Lewis fought, Williams began choking Lewis. He "couldn't stop" and ultimately strangled Lewis to death. Tr. Vol. 5 at 197.

Williams telephoned Tangiere Dauway and told her that Lewis was "gone." Tr. Vol. 3 at 33. Williams drove Lewis's car to Dauway's home. When he arrived at Dauway's, he told her, "I killed my baby's mother." *Id*. at 36. Dauway got in Lewis's car. Child was in her car seat in the back. Williams drove them back to Lewis's apartment.

Williams, Dauway, and Child went into Lewis's apartment. Williams led Dauway to a bedroom where Dauway saw Lewis's "lifeless body on the bed." *Id*. at 43. Dauway believed that Lewis had been strangled. *Id*. at 75. Williams asked Dauway to perform CPR on Lewis, but Dauway refused because Lewis

was already dead. Williams apologized to Lewis and kissed her on the forehead. Williams then got Child out of her car seat and asked her, "[D]o you want to see your mother for the last time?" *Id.* at 46. Williams held Child so that she could give Lewis a kiss.

[5] Williams and Dauway returned to Lewis's car and put Child in the back seat with some diapers and a suitcase that they had retrieved from Lewis's apartment. Williams went back into Lewis's apartment and returned to the car carrying Lewis's body. He put her body in the back seat and covered it with a black jacket. Williams drove Dauway home and told her that he had "some things to handle." *Id.* at 52. He left Child with Dauway and drove away in Lewis's car.

[6] While still driving Lewis's car, Williams picked up Alexis Alexander. They drove around until they found an abandoned house in Gary. They put Lewis's body in the basement and set her body on fire. Then, they returned to Dauway's home and picked up Child to take her to Williams's mother.[1]

[7] On April 15, 2016, Lewis's father reported to law enforcement that Lewis was missing. Detective Nathaniel Dillahunty of the Merrillville Police Department was assigned to investigate. On April 19, 2016, Detective Dillahunty interviewed Williams at the Merrillville police station. Detective Dillahunty advised Williams of his *Miranda* rights, and Williams signed a written waiver of

---

[1] Williams's mother brought Child to the police station on April 19, 2016.

those rights. Williams admitted no wrongdoing and was released. Detective Dillahunty also interviewed Alexander, who apparently admitted no wrongdoing and was released.

[8] Police continued to investigate Lewis's disappearance and discovered that Williams and Alexander had used Lewis's VISA debit card, which was linked to the account in which she received government assistance from the Indiana Family and Social Services Administration. Police also learned that Williams and Alexander had sold Lewis's vehicle to a local auto repair shop.

[9] On April 21, 2016, Detective Dillahunty interviewed Alexander at the Gary Police Department. After Alexander had been advised of and waived her *Miranda* rights, she informed Detective Dillahunty of the location of Lewis's body. Police went to the abandoned house and found Lewis's burned body in the basement. The coroner determined that Lewis's cause of death was asphyxiation due to strangulation and that the burns to her body were postmortem.

[10] Police arrested Alexander and brought Williams to the Gary Police Department for questioning. Detective Dillahunty and Merrillville Police Detective Robert Wiley interviewed Williams. At approximately 12:21 a.m. on April 22, Williams was advised of and signed a written waiver of his *Miranda* rights. The interview concluded at approximately 3:08 a.m., and Williams was arrested.

[11] At 3:20 a.m., Detective Wiley placed a handcuffed Williams in his police vehicle to transport him to the Lake County Jail. Tr. Vol. 5 at 188. Before

Detective Wiley had driven to the first stoplight, about a block away from the police station, Williams asked, "Can I ask you a hypothetical question?" *Id.* at 189. Williams also inquired as to whether Alexander had been arrested based on her statements to police and whether Detective Wiley was recording their conversation. After Detective Wiley told Williams that the vehicle did not have recording equipment, Williams asked, "[W]hat if somebody else was involved in this?" *Id.* at 191. Detective Wiley replied, "I can't answer that. I don't know their level of involvement. I don't know, you know, you've got to tell me more for me to answer that question." *Id.* Williams answered, "Well, what if I called someone to help me before I called [Alexander]." *Id.* Detective Wiley asked, "Help you what?" *Id.* Williams replied, "Come on, man." *Id.* at 192. Detective Wiley responded, "Look, it's you and me in here. We're not recording anything. We're two guys sitting in a truck. If we're going to talk like men, we'll talk like men, but I'm not going to play this game." *Id.*

[12]  Williams told Detective Wiley that he did not want Dauway involved "in any of this" and questioned the detective about what Alexander had told the police. *Id.* at 193. Williams informed Detective Wiley that Alexander had gone with him into the abandoned house and had carried the lighter fluid. *Id.* at 195. Detective Wiley asked, "Man, just what happened? What happened that day?" *Id.* Williams divulged that he and Lewis had been arguing and that he had choked and killed her. *Id.* at 197-98. At that point, Detective Wiley asked Williams if they could go to the police station and formally record their conversation. *Id.* at 199. Williams questioned whether Alexander would be at

the police station, and when he learned that she could be there, he said, "Let's just keep it like this. Let's just do this." *Id.* at 200. Williams then revealed that he had called Alexander and she helped him hide Lewis's body in the basement of the abandoned house and set the body on fire. *Id.* at 200-01. When they arrived at the jail at 3:37 a.m., Williams informed Detective Wiley that he "could write this all down if [he] want[ed] to." *Id.* at 202. Detective Wiley wrote down his recollection of their conversation within fifteen minutes.

[13] The State charged Williams with murder, level 6 felony altering the scene of a death, level 6 felony obstruction of justice, level 6 felony auto theft, level 6 felony mutilating a corpse, and level 6 felony fraud. Appellant's App. Vol. 2 at 46-47. Williams filed a motion to suppress his confession to Detective Wiley. Following an evidentiary hearing, the trial court denied Williams's motion.

[14] A six-day jury trial was held. Dauway, Detective Dillahunty, and Detective Wiley testified for the State. Williams objected to the admission of his confession. The trial court overruled his objection, and Detective Wiley testified that Williams confessed to Lewis's murder. The jury found Williams guilty as charged, and the trial court entered judgment of conviction on all counts.

[15] At the sentencing hearing, the trial court vacated the obstruction conviction on double jeopardy grounds and sentenced Williams to an aggregate term of seventy-two and a half years. This appeal ensued.

# Discussion and Decision

[16] Williams asserts that his confession should have been excluded because Detective Wiley should have readvised him of his *Miranda* rights. He argues that without that readvisement, he did not understand his right to remain silent and the ramifications of talking to Detective Wiley, and therefore his confession was not voluntary under either the United States or Indiana Constitutions.

[17] We review a trial court's decision to admit a confession for an abuse of discretion. *Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000). In determining whether the trial court abused its discretion, "we do not reweigh the evidence but instead examine the record for substantial probative evidence of voluntariness." *Id*. Also, "[w]e examine the evidence most favorable to the state, together with the reasonable inferences that can be drawn therefrom." *Pruitt v. State*, 834 N.E.2d 90, 115 (Ind. 2005). "If there is substantial evidence to support the trial court's conclusion, it will not be set aside." *Id*.

[18] "Under the Fifth Amendment to the United States Constitution and Article 1, Section 14 of the Indiana Constitution, persons shall be free from being compelled to make disclosures which might subject them to criminal prosecution or aid in their conviction." *Wells v. State*, 30 N.E.3d 1256, 1259-60 (Ind. Ct. App. 2015), *trans. denied*, *cert. denied* (2016). To secure a person's constitutional right against compulsory self-incrimination, the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory,

stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require law enforcement to advise a person who is going to be subjected to custodial interrogation by law enforcement "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id*. Once these so-called "*Miranda* rights" or "*Miranda* warnings" are provided, the individual may knowingly and intelligently waive his or her rights and agree to answer questions or make a statement. *Id.* at 479. "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [that individual]." *Id*.

[19] *Miranda* warnings are required only where a suspect is both in custody and subjected to interrogation. *Wells*, 30 N.E.3d at 1260. Under *Miranda*, custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. "'[I]nterrogation'" includes express questioning and "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).

[20] When a defendant challenges the voluntariness of a confession and waiver under the United States Constitution, the State is required to show by a preponderance of the evidence that the confession and waiver were voluntary. *Pruitt*, 834 N.E.2d at 114 (citing *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986) (voluntariness of waiver of *Miranda* rights) and *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972) (voluntariness of a confession)). However, the Indiana Constitution imposes a higher burden on the State, permitting the admission of a confession only if the State proves "beyond a reasonable doubt that the defendant voluntarily waived his rights, and that the defendant's confession was voluntarily given." *Id*. at 114-15 (quoting *Miller v. State*, 770 N.E.2d 763, 767 (Ind. 2002)). Under either federal or state law, when evaluating whether a statement was given voluntarily, "the trial court is to consider the totality of the circumstances, including: 'the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health.'" *Id*. (quoting *Miller*, 770 N.E.2d at 767); *see also Scalissi v. State*, 759 N.E.2d 618, 625 (Ind. 2001) (considering influences on voluntariness such as alcohol, drugs, and fatigue).

[21] Williams asserts that he should have been readvised of his *Miranda* rights because his formal interrogation had ended and he was being taken to jail, the police were done with their investigation, and Detective Wiley urged him to talk by saying, "Look, it's you and me in here. We're not recording anything. We're two guys sitting in a truck. If we're going to talk like men, we'll talk like men, but I'm not going to play this game." Tr. Vol. 5 at 192. Williams

acknowledges that when an interrogation is interrupted, "'a readvisment is only necessary when the interruption deprives the suspect of an opportunity to make an informed and intelligent assessment of his interests.'" Appellant's Br. at 13 (quoting *Wilkes v. State*, 917 N.E.2d 675, 683 (Ind. 2009)). He argues that his inquiries about posing a hypothetical question and the possibility of being recorded show that he had not had the opportunity to make an informed assessment of his interest when Detective Wiley urged him to talk.

[22] In *Wilkes*, the defendant argued that he should have received another set of *Miranda* warnings at the start of a police interview that was initiated four hours after the previous interview had ended. Our supreme court held that, while it might be the better practice to reiterate *Miranda* warnings, "'[i]t is generally accepted that fresh warnings are not required after the passage of just a few hours' [and as] the interruption in Wilkes's interrogation was part of a continuing investigation, [his] interests remained clear." 917 N.E.2d at 683 (quoting 2 WAYNE R. LAFAVE, *Criminal Procedure* § 6.8(b) (3d ed. 2007)). *See also Ogle v. State*, 698 N.E.2d 1146, 1148-49 (Ind. 1998) (concluding that second advisement of *Miranda* rights was not required where questioning resumed after half-hour break).

[23] Here, our review of the record reveals the following circumstances: on April 19 and 22, 2016, Williams was properly advised of his *Miranda* rights and knowingly and voluntarily waived his rights; on April 22, Williams was interviewed in connection with Lewis's murder; at the conclusion of the April 22 interview, Williams was arrested for Lewis's murder; only twelve minutes

elapsed between the end of the interview and the start of the conversation with Detective Wiley; Williams was in continuous police custody; Detective Wiley was one of the police officers who had just interviewed Williams; Williams initiated the conversation with Detective Wiley; at no time did Williams express a desire to stop talking to Detective Wiley or ask for an attorney; Williams was given an opportunity to stop the conversation so that it could be recorded at the police station, and he declined after learning that Alexander could be present at the police station; and Williams gave Detective Wiley permission to write down their conversation.

[24] Based on the totality of the circumstances, we cannot say that the cessation of the formal interrogation, the twelve-minute break, and the change in location upon Williams's arrest from police station to police vehicle deprived him of an opportunity to make an informed and intelligent assessment of his interests. Rather, there is substantial evidence to support the trial court's determination that Williams's confession was voluntary under either the federal or state constitution. Williams's argument boils down to an invitation to reweigh the evidence, which we must decline. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Williams's confession, and we affirm his convictions.

[25] Affirmed.

Bradford, J., and Tavitas, J., concur.