**Larry D. MITCHELL, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–0312–CR–625.**

Court of Appeals of Indiana.

Nov. 22, 2004.

Publication Ordered Jan. 18, 2005.

Kurt A. Young, Nashville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Appellant-defendant Larry D. Mitchell appeals his convictions for three counts of Murder,[1] a felony, one count of Attempted Murder,[2] a class A felony, one count of Robbery,[3] a class B felony, and one count of carrying a Handgun Without a License,[4] a class C felony. Specifically, Mitchell claims that the trial court committed fundamental error in instructing the jury that it could convict him as an accessory to attempted murder by finding that he knowingly aided, induced or caused another person to shoot Ashmore, one of the victims, as attempted murder requires specific intent to kill. Mitchell also claims that erroneous identification evidence offered by a victim was admitted at trial, and that the evidence was insufficient to support the convictions. Finally, Mitchell contends that the ninety-three-year enhanced sentence violated his Sixth Amendment right to a jury trial under the United States Constitution because the aggravating circumstances used to support the sentence were neither admitted by him nor found by a jury, thus contravening the rule announced in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Concluding that no reversible error occurred, we affirm the trial court's judgment.

## FACTS

The facts most favorable to the judgment are that beginning in October 2001, Anthony Ashmore—a freshman at Arlington High School in Indianapolis—began living with his sister Latanya, her two children, and Latanya's boyfriend, Edward Green.

On October 5, 2001, Ashmore arrived at the residence, and eventually fell asleep on a couch shortly after Latanya left the house. At some point, Ashmore was awakened by a gunshot and observed Brian Baxter in the doorway holding a revolv-

---

1. Ind.Code § 35–42–1–1.

2. I.C. § 35–42–1–1; Ind.Code § 35–41–5–1.

3. I.C. § 35–42–5–1.

4. Ind.Code § 35–47–2–1. This charge was elevated to a class C felony in light of Mitchell's prior felony conviction for Carjacking on August 24, 1994.

er. He also saw an African–American male carrying a grocery bag walk from the kitchen to the door. Terrance Thomas was standing next to Green, who was holding his side and moaning, "You already shot me." Tr. p. 143, 148–49. Thomas was observed holding Green's handgun. Baxter then began following the individual who was carrying the grocery bag outside. Thomas pointed Green's gun at him and demanded "everything." Tr. p. 152. The two men then struggled for control of the pistol, but Thomas ultimately shot Green in the head.

Thomas then pointed the gun at Ashmore and McGregor on the couch, but another individual—Edward Gilbert—entered the room, and Thomas shot him twice. Thomas then began shooting at Ashmore and McGregor. Ashmore was rendered unconscious but when he awoke, he noticed that McGregor appeared to be dead. Ashmore was then able to contact the police.

An autopsy report determined that McGregor died from two gunshot wounds. Gilbert also suffered two injuries, and it was revealed that he died from a shot to the shoulder that had perforated an artery. Green died from the gunshot wound to the head.

Later that evening—and after the shootings—several Indianapolis Police Department officers became involved in a car chase following a report that several suspects had fled from a stolen sport utility vehicle. The chase led to a neighborhood near Wishard Hospital. At some point, Officer Kenneth Kunz observed two African–American males running between some apartment buildings and directly toward his vehicle. Officer Kunz directed his spotlight on the two individuals, but they continued to flee from him. Officer Kunz exited his police vehicle, identified himself as a police officer, and ordered the

individuals to stop a number of times. Officer Kunz continued to chase the men and observed one of them carrying a white bag. He then followed the suspects into an apartment building and heard a door slam on the first floor. Officer Kunz knocked on one of the doors and, when it opened, Baxter was standing there with his hands up. He was arrested, and Thomas was also apprehended in the apartment.

The police also encountered Latanya in the apartment, whereupon she requested Officer Kunz to conduct a search of the residence. The officers eventually recovered the white bag that one of the suspects had been carrying. The bag contained the two handguns that were used to shoot the victims, along with a white sheet and some liquor. The police eventually interviewed Baxter, and he stated that he, Thomas and another individual who went by the nickname "Loc" had planned to rob Green. The police conducted a computer search, and it was revealed that Mitchell had the nickname of "Loc." Appellant's App. p. 35. Thomas and Baxter also identified Mitchell in a photo array as the third individual involved in the incident.

On October 10, 2001, the State charged Mitchell with three counts of Murder, three counts of Felony Murder, Attempted Murder, Conspiracy to Commit Robbery as a class A felony, Robbery as a class A felony, Unlawful Possession of a Firearm by a Serious Violent Felon as a class B felony, and Carrying a Handgun Without a License as a class C felony.

Mitchell was arrested on October 22, 2001. From October 27 through November 1, 2001, Mitchell was incarcerated at the City–County Building lockup in Indianapolis in the same holding cell as Danny Bradley. It was revealed that Mitchell and Bradley had known each other for several years.

At some point, Mitchell told Bradley that he had some "drama" and stated that he had "three M–1's." Tr. p. 277–778. Mitchell related to Bradley that he and two other men were planning to steal cash and cocaine from another individual. He went on to state that the robbery occurred in an apartment with three other males inside. Mitchell then told Bradley that after the robbery was completed, one of the victims grabbed for a gun but that one of the other individuals involved in the episode shot that person and two others. Mitchell also acknowledged to Bradley that he shot one of the victims who was admitted to the hospital in critical condition. Mitchell then told Bradley that he did not believe that the victim who had been hospitalized for gunshot wounds would be able to identify him because the victim had never met Mitchell before the robbery and shootings had occurred.

A jury trial was held on October 20, 2003. At one point, the State questioned Latanya about whether Mitchell had ever been in her apartment prior to the October 5, 2001 shootings. Latanya answered "no," and further testified that she saw an individual resembling Mitchell at a bus stop sometime prior to October 22, 2001. Tr. p. 110. Latanya stated that this individual appeared to have painted a mustache on his face, and was wearing a "hoodie." Tr. p. 112. Latanya then testified that she reported the incident to the police.

At the conclusion of the trial, Mitchell was found guilty of three counts of felony murder, one count of attempted murder, one count of robbery, and one count of carrying a handgun without a license. At the sentencing hearing on November 14, 2003, the trial court observed:

> Sir, at this time, the Jury having found you guilty as charged of Count One, the Felony Murder of Mr. Green—on that count, the Court is going to sentence you to sixty-five (65) years. The Court's going to order that you serve sixty-five (65) years executed in the Department of Corrections on count Three. The Court will sentence you to sixty-five (65) years in the Department of Corrections on Count Five. On Count Seven, the Attempt Murder of Anthony Ashmore, the Court is going to sentence you to fifty (50) years in the Department of Corrections. Robbery, Count Nine, a 'B' Felony. On that count, the Court is going to sentence you to twenty (20) years executed in the Department of Corrections. And on Count Sixteen, Carrying a Handgun Without a License as a Class C Felony, the Court is going to ... sentence you to eight (8) years executed in the Department of Corrections. The Court is going to order that Counts 1, 9 and 16 be served consecutive to one another—all the other counts will be concurrent.

Appellant's Br. p. 3–4. In light of the above, Mitchell was sentenced to an aggregate term of ninety-three years.

When deciding the sentence, the trial court found no mitigating circumstances and found the following aggravating factors: (1) Mitchell's "horrible criminal history of violent criminal activity beginning as a juvenile;" (2) Mitchell was on probation at the time that the instant offenses were committed; (3) the nature and circumstances of the offense, in that this was a particularly heinous crime; (4) the planning and conspiracy to commit the robbery; and (5) the fact that Mitchell was a major participant in the crime. Tr. p. 462–63. Mitchell now appeals.

## DISCUSSION AND DECISION

### I. Jury Instructions

Mitchell first contends that his conviction for attempted murder must be re-

versed because the jury was improperly instructed. Specifically, Mitchell claims that it was error to instruct the jury that it could convict him as an accessory to the offense of attempted murder by finding only that he knowingly aided, induced or caused another person to shoot Ashmore, inasmuch as attempted murder requires specific intent to kill.

 In addressing Mitchell's contentions, we initially observe that the manner in which a jury is instructed rests with the trial court's discretion, and we will reverse only when an abuse of that discretion occurs. *Powell v. State,* 769 N.E.2d 1128, 1132 (Ind.2002). Instructions should inform the jury regarding the law applicable to the facts without misleading it and should enable the jury to understand the case and arrive at a just, fair, and correct verdict. *Turner v. State,* 755 N.E.2d 194, 198 (Ind.Ct.App.2001), *trans. denied.* Additionally, jury instructions are to be considered as a whole and in reference to each other. *McBride v. State,* 785 N.E.2d 312, 316 (Ind.Ct.App.2003), *trans. denied.*

 We also note that in order to preserve an alleged error as it pertains to an instruction, a party is required to make a timely objection to the proposed instruction. *Mitchell v. State,* 742 N.E.2d 953, 954 (Ind.2001). However, if the erroneous instruction is a substantial and blatant violation of basic principles, rendering a trial unfair to the defendant, the error will be deemed fundamental. *Id.* The fundamental error doctrine is one of extremely narrow applicability. *Carter v. State,* 754 N.E.2d 877, 881 (Ind.2001). To be sure, this doctrine applies only when the actual or potential harm "cannot be denied." *Id.*

 In this case, Mitchell failed to object to the instructions regarding attempted murder and accomplice liability. Thus, the issue is waived. *See Mitchell,*

742 N.E.2d at 954. However, in arguing that fundamental error occurred, Mitchell relies on the principle that instructions regarding the offense of attempted murder must inform the jury of the appropriate mens rea that is necessary to convict a defendant of attempted murder. *Williams v. State,* 737 N.E.2d 734, 737 (Ind.2000). That is, a conviction for attempted murder requires proof of the specific intent to kill, and the jury must be so instructed. *Id.* This rule notwithstanding, it has also been held that fundamental error is not shown when the record shows that the defendant's intent is not at issue. *Hopkins v. State,* 759 N.E.2d 633, 638 (Ind.2001).

To illustrate, in *Swallows v. State,* our supreme court determined that no fundamental error occurred when it was shown that the defense had relied upon the identity of the perpetrator, and the defendant's intent was not at issue. 674 N.E.2d 1317, 1318 (Ind.1996). As in *Swallows,* the theory of Mitchell's defense was that the State could not prove beyond a reasonable doubt that Mitchell was at the robbery. Tr. p. 425. Instead, the question of the identity of the third person involved in the commission of the offenses was at issue. Tr. p. 420–25.

 Here, Bradley testified that Mitchell told him the victims were shot "[s]o they wouldn't have no witnesses." Tr. p. 287–88. Thus, it is apparent that the murders and attempted murder were part of the defendants' plan to eliminate any surviving witnesses who could implicate them in the crimes. Accordingly, because Mitchell did not object at trial to these instructions, and his intent regarding the commission of the offenses was not at issue, any alleged instructional error that occurred does not amount to fundamental error. *See Hopkins,* 759 N.E.2d at 638.

## II. Erroneous Admission of Evidence

Mitchell next contends that the remainder of his convictions must be reversed because the trial court erred in admitting Latanya's testimony that she saw Mitchell—or someone else who bore the same physical characteristics as one of the perpetrators—at a bus stop sometime after the incident, wearing a hoodie and a disguise that consisted of a moustache that had been painted on his face. In essence, Mitchell maintains that the admission of this testimony was reversible error because Latanya's testimony was "equivocal, was not relevant, was not probative, and was unconnected to anything in the case." Appellant's Br. p. 20.

In addressing Mitchell's contention, we first note that the admission or exclusion of evidence lies within the sound discretion of the trial court. *Johnson v. State,* 734 N.E.2d 530, 532 (Ind.2000). We will not reverse the trial court's decision unless its action is clearly against the logic and effect of the facts and circumstances before the court. *McCotry v. State,* 722 N.E.2d 1265, 1267 (Ind.Ct.App.2000), *trans. denied.* Moreover, error may not be predicated upon an evidentiary ruling unless the substantial rights of a party are affected. Ind. Evidence Rule 103(a).

■■ Here, Mitchell asserts that he was prejudiced by Latanya's testimony because the jury was left "with the impression that Mr. Mitchell was seen shortly after the crime attempting to disguise or conceal his appearance." Appellant's Br. p. 22. However, as Mitchell acknowledges, Latanya merely testified that she saw an individual at a bus stop similar in appearance to Mitchell nearly two weeks after the murders had occurred. Mitchell does not indicate that the jury may have relied on this testimony in determining whether he was actually involved in the robberies and murders. Even more compelling, we note that Latanya had already testified without objection that she had observed a person similar to Mitchell at a bus stop and had reported that information to police. Tr. p. 110. As our supreme court has observed, "the erroneous admission of evidence which is cumulative of other evidence admitted without objection does not constitute reversible error." *Wolfe v. State,* 562 N.E.2d 414, 421 (Ind.1990). Thus, even if it could be said that Latanya's objected-to testimony was erroneously admitted, the error was harmless. We also note that inasmuch as Latanya's testimony showed that she was unsure as to whether the person she saw at the bus stop was Mitchell or someone who just looked like him, we cannot say that Mitchell has shown any prejudice in this instance. Thus, Mitchell cannot succeed upon this claim of error.

## III. Sufficiency of the Evidence

Mitchell next argues that the evidence is insufficient to support his convictions. Specifically, Mitchell contends that we must reverse because the only evidence connecting him to the crimes was the testimony of Danny Bradley regarding the statements that Mitchell allegedly made to him in the Marion County Jail. In a similar vein, Mitchell asserts that Bradley's testimony was inherently improbable, coerced, equivocal, wholly uncorroborated and, thus, incredibly dubious.

■■■ In resolving this issue, we initially observe that this court will affirm a defendant's conviction if, considering only the probative evidence and reasonable inferences supporting the trial court's judgment, and without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Rogers v. State,* 741 N.E.2d 395, 396 (Ind. Ct.App.2000), *trans. denied.* Inconsisten-

cies in the evidence are for the jury to evaluate, and it is for the jury to determine what evidence to believe. *Miller v. State*, 770 N.E.2d 763, 774–75 (Ind.2002). Additionally, we will not impose upon the jury's responsibility to assess the credibility of the witness unless confronted with inherently improbable testimony, or coerced, equivocal, or wholly uncorroborated testimony of incredible dubiosity. *Ealy v. State*, 685 N.E.2d 1047, 1056–57 (Ind.1997). Application of the "incredible dubiosity" rule is limited to cases where a sole witness presents inherently contradictory testimony that is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the defendant's guilt. *Thompson v. State*, 765 N.E.2d 1273, 1274 (Ind.2002). Reversal under this rule is rare and the testimony at issue must be "so incredibly dubious or inherently improbable that no reasonable person could believe it." *Love v. State*, 761 N.E.2d 806, 810 (Ind.2002).

██ In this case, we initially observe that Bradley's testimony was not the only evidence connecting Mitchell to the crimes. To be sure, the record shows that Bradley's testimony was consistent in many respects with that of Anthony Ashmore. For instance, Bradley testified that Mitchell told him there were three men in the apartment when the robbery occurred. Tr. p. 283. Anthony testified that he, Green and McGregor were in the apartment when Anthony awoke during the robbery. Tr. p. 143–46. Mitchell told Bradley that he and his accomplices seized drugs and cash inside the apartment, and one of the victims reached for a gun. Tr. p. 283, 285. Bradley went on to testify that Mitchell admitted to shooting one of the victims in the chest with a .38 caliber pistol. Tr. p. 287. Anthony testified that he awoke after a gunshot, and he discovered that Green had been shot in the chest

by a .38. Tr. p. 145–49, 325–27. The ballistics evidence also confirmed that Green was shot with a .38 caliber pistol. An African–American male was carrying a bag and walking toward the door. Tr. p. 147–48. Baxter was standing near the door and holding a .38. Tr. p. 146. In light of this evidence, the jury could have inferred, based on Anthony and Bradley's testimony in conjunction with the other evidence—including the ballistics report—that Mitchell had shot Green with the .38 and subsequently handed the weapon to Baxter for the purpose of guarding the door so that Mitchell could carry the bag of drugs and cash from the residence that Mitchell, Baxter, and Thomas had seized.

We also note that Bradley's and Anthony's testimony was consistent with respect to the allegation that Thomas shot Green with Green's gun. Tr. p. 151, 153–54, 287. For instance, Bradley testified that Mitchell stated to him that Thomas shot the victim who had already been shot in the chest. Tr. p. 287. Bradley went on to assert that Mitchell told him that Thomas used the victim's nine millimeter gun. Tr. p. 287. Anthony's testimony and the ballistic evidence also showed that Thomas had shot Green with Green's own nine millimeter gun. Tr. p. 151, 153–54, 325–27.

Despite this evidence, Mitchell goes on to argue that because Bradley "testified that there were three people shot," and not four, "a serious fundamental difference [existed] between the facts of the case and Mr. Bradley's testimony." Appellant's Br. p. 25. However, the record demonstrates that the prosecutor asked Bradley, "Did [Mitchell] provide you information as to how many people were inside the apartment when [Mitchell] went in?" Tr. p. 283. Bradley replied, "Three." Tr. p. 283. Such evidence was consistent with Anthony's testimony that three people were in-

side the apartment when the crime spree ensued. Tr. p. 143–44.

Mitchell also notes that Bradley testified that Mitchell reported the physical conditions of three of the victims to him, but did not mention the fourth. Tr. p. 289. However, this provides further evidence of the authenticity of Bradley's testimony, inasmuch as Anthony testified that the fourth victim, Gilbert—who was shot by Thomas—entered the apartment after the unidentified African–American male and Baxter had walked out with the bag. Thus, it is not surprising that Mitchell did not mention the physical condition of the fourth victim when he talked to Bradley.

Also, had Bradley simply read about the crimes as Mitchell asserts, it is much more likely that he would have known four people were shot, but would not have known that Thomas had used Green's own nine-millimeter gun to shoot Green after he had first been shot by the .38. Moreover, the evidence at trial indicated that Bradley was not able to read. Tr. p. 295, 97. As a result, the jury could certainly conclude that Bradley's testimony was credible. In light of the above, the "incredible dubiosity" rule does not apply here. Moreover, the information of which Mitchell complains goes to the weight to be given the testimony by the trier of fact. The record shows that Bradley was extensively cross-examined by Mitchell's defense counsel, and we will not substitute our judgment for that of the jury's as to a witness's credibility. Thus, Mitchell's arguments with respect to the sufficiency of the evidence must fail, and the convictions may stand.

### IV. Blakely Argument

Finally, we address Mitchell's contention that his sentence must be set aside because his Sixth Amendment right to a jury trial was violated. Mitchell's sole basis for attacking the validity of his sentence is that the sentence may not stand because a jury did not find the existence of any aggravating circumstances, and Mitchell did not admit the existence of such factors, thus violating the rule announced in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

We note that the *Blakely* court applied the rule set forth in *Apprendi v. New Jersey*—"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt"—and found the sentencing scheme at issue did not pass constitutional muster. *Blakely*, —— U.S. at ——, 124 S.Ct. at 2536; *Apprendi*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). "The relevant statutory maximum for *Apprendi* purposes is the maximum a judge may impose based solely on the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, —— U.S. at ——, 124 S.Ct. at 2537. At least one panel of this court has observed that "Indiana courts have not yet considered what effect, if any, the *Blakely* opinion may have on Indiana's sentencing scheme." *Carson v. State*, 813 N.E.2d 1187, 1189 (Ind.Ct.App.2004).

Here, Mitchell argues that the trial court was without authority to impose a sentence greater than the presumptive term without finding the existence of aggravating factors that were not elements of the offense itself. Appellant's Br. p. 4. *Mitchell* asserts:

[He] was sentenced to three 65 year sentences on each of the three murders of which he was convicted. In relevant part, the sentence for murder, a felony, Ind.Code § 35–42–1–1, is a 'fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances...." Ind.Code § 35–50–2–3(a). He was also sentenced to 50

years on the attempted murder conviction. The sentence for attempted murder, a class A felony, Ind.Code § 35–41–5–1(a) is "a fixed term of thirty (30) years, with not more than twenty (20) years added for aggravating circumstances...." Ind.Code § 35–50–2–4. He was sentenced to 20 years on the B felony robbery conviction. The sentence for a robbery, a B felony, Ind.Code § 35–42–5–1, is 'a fixed term of (10) years, with not more than ten (10) years added for aggravating circumstances....' Ind.Code § 35–50–2–5. He was sentenced to eight [8] years on the conviction of carrying a handgun without a license. The sentence for carrying a handgun without a license, a class C felony, Ind.Code §§ 35–47–2–1 and 35–47–2–23(c), is a fixed term of four (4) years, with not more than four (4) years added for aggravating circumstances.... Ind.Code § 35–50–2–6.

Appellant's Br. p. 26–27.

In light of the above, Mitchell contends that his sentence must be set aside because the factual determinations that were deemed aggravating factors by the trial court, including: (1) his juvenile history; (2) the heinousness of the offense; (3) the observation that Mitchell was a major participant in the crimes; and (4) the fact that Mitchell and his codefendants had planned to commit the robbery were never specifically submitted to a jury. Appellant's Supp. Br. p. 6.

In addressing Mitchell's claims, we note that at no time before the trial court did Mitchell raise any objection—either specifically under *Apprendi* or generally under the Sixth Amendment right to trial by jury—to the court's finding of aggravating circumstances or imposition of an enhanced sentence. Thus, his contention is waived. *See Carson*, 813 N.E.2d at 1189; *see also Mitchell v. State*, 730

N.E.2d 197, 201 (Ind.Ct.App.2000) (holding that when a defendant does not properly bring an objection to the trial court's attention so that the trial court may rule upon it at the appropriate time, he is deemed to have waived that possible error). The United States Supreme Court issued its opinion in *Apprendi*, upon which the defendant in *Blakely* objected to his "exceptional" sentence, well before Mitchell's sentencing hearing in 2004. That the *Apprendi* rule was extended in *Blakely* is of no moment, inasmuch as Mitchell should have objected on *Apprendi* grounds and preserved this issue, just as the defendant in *Blakely* did. As a result, we decline to disturb Mitchell's sentence.

The judgment of the trial court is affirmed.

KIRSCH, C.J., and ROBB, J., concur.

### ORDER

This Court having heretofore handed down its opinion in this appeal on November 22, 2004, marked Memorandum Decision, Not for Publication.

The Appellee, by counsel, has filed its Verified Motion for Publication of Memorandum Decision, alleging therein that said decision clarifies existing law inasmuch as it holds that a defendant who does not raise an objection, either specifically under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348 (2000) or generally under the sixth Amendment right to trial by jury, to the trial court's finding of aggravating circumstances or imposition of an enhanced sentence may not challenge his sentence on this basis in appeal.

Said Motion further alleges that this would be the first published decision in Indiana on this issue and that this decision would aid trial courts, practitioners, and defendants on said issue.

The Court notes that the Appellant has filed a Response to the Appellee's Motion for Publication.

The Court having examined these matters and being duly advised, now FINDS AND ORDERS that the Appellee's Motion for Publication of Memorandum Decision should be and the same now is GRANTED, and the Memorandum Decision is now ordered PUBLISHED.

All Panel Judges Concur.