**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 12 2014, 10:19 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE M. COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

BRADLEY S. STOCK,              )
                              )
    Appellant-Defendant,       )
                              )
        vs.                 )    No.24A05-1308-CR-403
                              )
STATE OF INDIANA,             )
                              )
    Appellee-Plaintiff.        )

APPEAL FROM THE FRANKLIN CIRCUIT COURT
The Honorable J. Steven Cox, Judge
Cause No. 24C01-1208-FC-1246

**June 12, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Bradley S. Stock appeals his convictions for class C felony Child Molesting,[1] class C felony Vicarious Sexual Gratification,[2] class D felony Performing Sexual Conduct in the Presence of a Minor,[3] and class D felony Child Solicitation.[4]  Stock presents the following restated issues for review:

1. Was improper vouching testimony admitted at trial?

2. Were the victim's out-of-court statements erroneously admitted into evidence?

3. Was the child victim's testimony incredibly dubious?

We affirm.

This case arises from a claim by Stock's daughter, C.S.,[5] that he sexually abused her over a period of years.  On March 11, 2011, C.S., then eight years old and in third grade, made a card for her substitute teacher.  C.S. was typically a well-behaved student but that day had had difficulty concentrating on her work.  The substitute asked if something was wrong, and C.S. made the card later that day.  It stated in relevant part:  "Dear Mrs. Dye, your very nice I will try not to poll any more cloaths pins and yes there is somthing I want to say about Me and my dad But out in the hall when ~~nowon~~ none else is out there!"  *Exhibit Binder*, State's Exhibit 1 (transcribed verbatim).  After speaking with C.S., the teacher took her to the guidance counselor, Pam Gutzwiller, where C.S. made a detailed statement about her father.

---

[1]   Ind. Code Ann. § 35-42-4-3 (West, Westlaw current with all legislation of the 2nd Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014).

[2]   I.C. § 35-42-4-5 (West, Westlaw current with all legislation of the 2nd Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014).

[3]   *Id*.

[4]   I.C. § 35-42-4-6 (West, Westlaw current with all legislation of the 2nd Regular Session of the 118th General Assembly (2014) with effective dates through May 1, 2014).

[5]   Born April 2002.

This prompted Gutzwiller to immediately report the conversation to the Indiana Department of Child Services (DCS). DCS investigator Catherine McNamara came to the school and interviewed C.S. in Gutzwiller's presence. C.S.'s statement to McNamara remained consistent with what she had reported to Gutzwiller, with one or two exceptions.

That afternoon, McNamara and Franklin County Deputy Sheriff John Roberts drove to the Stock home, where C.S. lived with Stock, her mother (Mother), and her older brother, B.S. After speaking with Mother and receiving unsatisfactory responses, McNamara informed Mother that she was going to remove the children from the home. Mother called Stock at work. Upon arriving home and speaking briefly with Mother, Stock voluntarily spoke with Deputy Roberts in his police vehicle. Stock indicated that he knew the allegations involved him using a vibrator on his daughter. He then pointed to a teenage girl next door and stated that she possibly coerced C.S. into making the allegations. Stock stated that he did have a porn collection and that C.S. had unexpectedly walked in on him watching one of these movies and masturbating. Stock admitted that he routinely slept naked and that C.S. slept in his and his wife's bed almost every night. He said that on a few occasions C.S. might have seen him as he walked naked to the restroom with his "morning woody." *Transcript* at 335. Stock also informed Deputy Roberts that he had caught C.S. masturbating "a frick'n dozen times." *Id*. at 337.

DCS immediately removed C.S. and B.S. to foster care, and a CHINS case was filed.[6] C.S. maintained contact with Mother but did not see Stock until the two-day jury trial in this case, which commenced on June 24, 2013. C.S., then age eleven, testified in detail regarding the years of abuse she suffered at the hands of her father when she was between the ages of two and eight.

C.S. testified that she slept in her parents' king-size bed almost every night because she was scared of the dark. When Mother was sleeping, Stock would pull C.S. over to him, hold her close to his naked body, and rub her vagina with his fingers. When Mother worked weekends and B.S. was away, Stock would make her sit and watch pornographic movies with him. He would rub his penis up and down during the movies, as well as other times in C.S.'s presence. One time he asked C.S. to touch his penis in exchange for going to a friend's house. C.S. refused and went to her room instead. On another occasion, C.S. recalled Stock calling her into the bathroom. She testified, "he was in like a peeing position and he was rubbing his penis and white stuff came out" the tip of his penis. *Id.* at 203. He told her, "this is how a man cums." *Id.*

During her testimony, C.S. also described a number of vibrators in the home and indicated their purpose. She testified that Stock placed the black vibrator on her "body part" once. *Id.* at 202. He also put vibrators in her bedroom for her to use. She told him she would use them, but she did not.

---

[6] Within weeks, B.S. was returned to his parents' home. Stock and Mother separated in July 2011 and later divorced.

4

The jury convicted Stock as set forth above, and he was sentenced to an aggregate term of ten years, with two of those years suspended to probation. Stock now appeals, challenging the admission of certain evidence and arguing that C.S.'s testimony was incredibly dubious.

1.

We initially address Stock's claim that improper vouching testimony regarding C.S.'s credibility was admitted in violation of Ind. Evidence Rule 704(b).[7] Stock acknowledges that he did not object to each instance of vouching but argues that admission of this evidence amounted to fundamental error.

The admission of evidence is within the discretion of the trial court, and we will disturb its rulings only where it is shown that the court abused that discretion. *Hoglund v. State*, 962 N.E.2d 1230 (Ind. 2012). An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances. *Id*. Moreover, errors in the admission of evidence are to be disregarded generally unless they affect the substantial rights of a party. *Id*.

When a party fails to object to evidence at trial, review of the issue is waived unless fundamental error occurred. *Id*. To be fundamental, "the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process." *Id*. at 1239. "Harm is not shown by the fact that

---

[7] Evid. R. 704(b) provides as follows: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

5

the defendant was ultimately convicted; rather harm is found when error is so prejudicial as to make a fair trial impossible." *Id.*

Stock challenges evidence admitted through three witnesses. We turn first to Gutzwiller's testimony. At the conclusion of direct questioning, the State asked Gutzwiller: "[d]uring your interview were you able to come up with any motive for [C.S.] to lie?" *Transcript* at 182. Stock objected, arguing that the State was invading the province of the jury. The trial court prompted the State to rephrase the question, which it did:

> Q. Did you found [sic] anything out that would cause you concern with her statement about her…
> A. I had no reason to believe she wasn't telling me the truth.

*Id.* Stock did not object to the question as rephrased.

During direct examination of McNamara, the State asked, "[d]uring all the time you had with [C.S.], find any motive, reason for her to make this up?" *Id.* at 236. McNamara responded, "[n]ot at all." *Id.* Stock did not object.

Finally, during Mother's testimony, the State asked her if she knew of anything that C.S. might have had to gain by making up the allegations. Mother responded, "[a]solutely not." *Id.* at 304. After Stock asserted a nonspecific objection, the following occurred:

> COURT: Well, you can ask the question.
> Q. I think your answer was, you didn't have any because you don't know.
> A. She had no reason at all.
> COURT: Well, that wasn't the question. It's not responsive to the question. The question was, do you know of any reason she would have had?
> [STATE]: Ok.
> WITNESS: No.

*Id.* at 305. Again, Stock did not properly preserve any claim of error in regard to this testimony. *See Gayden v. State*, 863 N.E.2d 1193, 1198 (Ind. Ct. App. 2007) ("trial objection must include the specific ground for the exclusion of evidence"), *trans. denied*.

Stock argues that the State offered improper vouching evidence through the testimony of the three witnesses set out above. Specifically, he claims that the evidence "focused to some extent on C.S.'s lack of motive to lie", which is the same type of vouching testimony that our Supreme Court found improper in *Hoglund*. *Appellant's Brief* at 16. Even assuming error, however, Stock has not established that the error was fundamental.

In the instant case, there was substantial evidence of Stock's guilt apart from any erroneously admitted vouching testimony. C.S. testified at length concerning what happened to her at the hands of her father, and she remained "consistent and unshaken" in her testimony during cross examination. *Hoglund v. State*, 962 N.E.2d at 1238. "The testimony of a sole child witness is sufficient to sustain a conviction for molestation." *Id.* at 1239.

Moreover, the witnesses in this case did not directly vouch for C.S.'s credibility and vouching was not the focus of their overall testimony. This is unlike *Rose v. State*, 846 N.E.2d 363 (Ind. Ct. App. 2006), a case relied upon by Stock on appeal. In *Rose*, the vouching statements came from a doctor who examined the alleged victim. The doctor testified repeatedly ("at least *eight* times") regarding the child's credibility and how convincing her allegations were. *Id.* at 367 (emphasis in original). The doctor's vouching statements were direct, deliberate, and "the centerpiece of his testimony." *Id.* at 369 ("[i]ndeed, his testimony was not based on medical evidence but on his belief that A.G. was

7

telling the truth"). The challenged testimony in this case was marginal in comparison,[8] and "its admission was not a blatant violation amounting to fundamental error." *Hoglund v. State*, 962 N.E.2d at 1239-40. Accordingly, Stock has not established fundamental error.

2.

Stock contends that evidence of C.S.'s prior statements to McNamara and Gutzwiller were improperly admitted at trial. Once again, he acknowledges that some of this hearsay evidence came in without him raising a timely objection.

During its direct examination of McNamara, the State carefully avoided testimony regarding what C.S. had told her on the day the allegations arose. On cross-examination, however, Stock specifically asked McNamara about C.S.'s statement, including whether C.S. had stated that Stock had never touched her and she had never touched him. Further, Stock asked what C.S. told McNamara regarding the age when the alleged abuse began and whether she had told anyone of the abuse previously.

On redirect, the State asked McNamara about C.S.'s statement during her interview of the child in Gutzwiller's office:

> Q. And he said, did she tell you that he did not touch her?
> A. She did not say that.
> Q. Ok, what did she say?

---

[8] Stock also directs us to *Bradford v. State*, 960 N.E.2d 871 (Ind. Ct. App. 2012), a case in which a child protective services investigator testified, over an objection by the defendant, "I substantiated sexual abuse, meaning our office feels that there was enough evidence to conclude that sexual abuse occurred." *Id*. at 876. We concluded that the testimony constituted an inadmissible opinion regarding the truth of the allegations, in violation of Evid. R. 704(b). Relying on *Bradford*, Stock directs us to two instances in which McNamara used the term "substantiate" or "substantiated". *Transcript* at 253, 258. These references were during Stock's own cross-examination of McNamara, and Stock made no objection. Further, they amounted to only passing references without further explanation by the witness.

8

[Stock objected on hearsay grounds, and the trial court overruled the objection based upon the doctrine of completeness.]

\*\*\*\*

Q. And the question on cross was, did [C.S.] tell you that he did not … the defendant did not touch her?

A. She told me he did touch her.

Q. He did. And where did she say …where did he [sic] say he touched her?

A. I asked with what, she said his hands and a [sic] orange and white thing that vibrates. I asked where, she said, her vagina. I asked inside or outside, and she said inside.

Q. And then he asked you, did he make … did the defendant make [C.S.] touch him anywhere, ….

A. Right.

Q. … and what did she answer?

A. She said, no.

Q. And that has been consistent throughout.

A. Yes.

Q. What else did she tell you that day?

A. That he would play board games with her, put [sic] he would play with his robe untied, and he would touch his winkie while he was playing. That he … he would also touch himself while playing video games, and that one day she went to use the bathroom. He was in the bathroom. She went to brush her hair. He was in the bathroom. She went to leave the bathroom, he said, no, stay, and he began to … and she demonstrated a masturbation …

Q. How did she demonstrate?

A. She … rubbing up and down on his private area, and she said white stuff came out, and he said this is how a man cums.

Q. And on the other times when you said he had his robe open, things like that, and he touched his private or whatever. When she said touched, did she say how he did it then.

A. She did not demonstrate for me.

Q. Ok, just said he touched it?

A. Yes.

Q. And she talk anything about the pornography at that point?

A. She briefly mentioned movies and that is how babies are made. She was told that is how babies are made, and that she had seen [Stock] do that with [Mother].

9

*Transcript* at 269-273.  At this point, Stock objected again, and the trial court directed the State to confine its questioning to the statement C.S. made in Gutzwiller's office.  Shortly thereafter, the State ended its questioning of McNamara.

According to the doctrine of completeness, when a party introduces part of a conversation, the opposing party is generally entitled to have the entire conversation placed into evidence.  *McElroy v. State*, 553 N.E.2d 835 (Ind. 1990).  The doctrine has been incorporated into Indiana Evidence Rule 106 with respect to written and recorded statements, but the common-law doctrine of completeness is also still viable with respect to conversations.  *Lewis v. State*, 754 N.E.2d 603 (Ind. Ct. App. 2001), *trans. denied*.  The rule prevents a party from misleading the jury by presenting statements out of context.  *Sanders v. State*, 840 N.E.2d 319 (Ind. 2006).  "The remainder of the statement or document is subject to the general rules of admissibility, however, and any portions found immaterial, irrelevant, or prejudicial must be redacted."  *Evans v. State*, 643 N.E.2d 877, 881 (Ind. 1994).

Here, the initial questions asked by the State upon redirect examination plainly fell within the doctrine of completeness and were properly permitted by the trial court.[9]  The redirect eventually addressed details of C.S.'s statement well beyond those discussed during cross-examination, but the testimony all related to the same statement.  Moreover, Stock did not raise another objection until after McNamara had testified regarding the additional details.  His untimely objection did not preserve the issue for review.

---

[9]  Contrary to Stock's unsupported assertion on appeal, the doctrine applies equally to the State and the defendant.  *See Evans v. State*, 643 N.E.2d 877 (applying the doctrine in favor of the State).

Stock similarly questioned Gutzwiller, during his case-in-chief, about the statement C.S. made to her in her office. He elicited testimony regarding specific responses the child gave when asked certain questions by Gutzwiller. Stock also inquired of Gutzwiller the time frame C.S. provided for the alleged abuse and the particular words she used. On cross-examination, the State inquired into specific details of the sexual abuse reported by C.S. Stock did not object.

In an attempt to avoid waiver, Stock asserts that admission of the out-of-court statements constituted fundamental error because the hearsay statements "bolstered C.S.'s credibility." *Appellant's Brief* at 30. Stock cites no authority in support of his claim of fundamental error, aside from the boilerplate standard.

Our Supreme Court has made clear that the fundamental error doctrine has "extremely narrow applicability". *Carter v. State*, 754 N.E.2d 877, 881 (Ind. 2001). As set forth above, it applies only when the error is so prejudicial to the rights of the defendant as to make a fair trial impossible. *Carter v. State*, 754 N.E.2d 877. "An appellate court receiving contentions of fundamental error need only expound upon those it thinks warrant relief. It is otherwise adequate to note that the claim has not been preserved." *Id*. at 881. Stock's cursory fundamental error argument does not warrant exception to the general rule requiring preservation of error, especially in light of the fact that much of Stock's defense at trial (as well as his sufficiency argument on appeal) was based upon inconsistencies between C.S.'s trial testimony and her initial statements to McNamara and Gutzwiller.

11

3.

Finally, Stock argues that the State presented insufficient evidence to support his convictions. On review of claims regarding the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. *Lock v. State*, 971 N.E.2d 71 (Ind. 2012). We consider only the evidence and reasonable inferences that support the verdict. *Id*. Moreover, the sole testimony of a child victim is sufficient to sustain a conviction. *See Hoglund v. State*, 962 N.E.2d 1230.

Stock recognizes that his sufficiency claim cannot succeed against C.S.'s testimony unless he establishes that her testimony was incredibly dubious. Under the incredible dubiosity rule, we will impinge on a jury's responsibility to judge witness credibility only in very narrow circumstances "where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity." *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). "Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." *Id*.

Stock argues that C.S.'s account of the alleged offenses was equivocal. It was not. We remind Stock that inconsistencies between a witness's pretrial statement and trial testimony do not render the testimony inherently contradictory or incredibly dubious. *See Corbett v. State,* 764 N.E.2d 622 (Ind. 2002); *Stephenson v. State,* 742 N.E.2d 463 (Ind. 2001). Further, contradiction between witnesses' testimony does not make evidence incredible under this rule. *See Stephenson v. State,* 742 N.E.2d 463.

The incredible dubiosity rule is not applicable here because C.S.'s trial testimony was unequivocal and not coerced. Moreover, small but significant details of her testimony were corroborated by Stock's own pretrial statements and trial testimony.[10] We find Stock's argument to be nothing more than an invitation for us to reweigh the evidence and judge the credibility of the witnesses, which we will not do. The jury believed C.S.'s testimony, which was sufficient to support the guilty verdicts in this case. We decline to impinge on the jury's credibility determinations, as a reasonable person could certainly believe C.S.'s trial testimony. *See Campbell v. State*, 732 N.E.2d 197, 207 (Ind. Ct. App. 2000) ("[i]ncredibly dubious or inherently improbable testimony is that which runs counter to human experience, and which no reasonable person could believe"); *Hampton v. State,* 921 N.E.2d 27 (Ind. Ct. App. 2010) (holding that the testimony of the seven-year-old victim was not incredibly dubious and affirming the defendant's child molesting conviction), *trans. denied.*

Judgment affirmed.

MATHIAS, J., and PYLE, J., concur.

---

[10] For example, Stock freely told Deputy Roberts that he slept in the nude with C.S. on a regular basis. He also indicated that she had walked in on him while he was watching an adult movie and masturbating and that on other occasions she might have seen him walking around naked with an erection. At trial, Stock testified that he found a vibrator in C.S.'s bedroom closet when she was four or five and two more in the basement after she was removed. Though these facts alone would not support the convictions, they do lend support to C.S.'s testimony.