## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 24 2017, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

---

ATTORNEYS FOR APPELLANT

Joel C. Wieneke
Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

William Culler,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 24, 2017

Court of Appeals Case No.
33A05-1611-CR-2702

Appeal from the Henry Circuit Court

The Honorable Kit C. Dean Crane, Judge

Trial Court Cause No.
33C02-1603-FA-2

**Bradford, Judge.**

# Case Summary

[1] Between late-2009 and February of 2014, Appellant-Defendant William Culler molested his step-daughter, Y.R., on numerous occasions. In March of 2016, Culler was charged with three counts of Class A felony child molesting, one count of Class C felony child molesting, three counts of Class D felony vicarious sexual gratification, and one count of Class B misdemeanor battery. Following a three-day jury trial, Culler was found guilty of all but the Class B misdemeanor battery count. The trial court subsequently sentence Culler to an aggregate 110-year sentence with 108 years executed in the Department of Correction ("DOC") and two years suspended to probation.

[2] On appeal, Culler challenges the sufficiency of the evidence to sustain two of his three convictions for Class A felony child molesting. Culler also contends that the trial court committed fundamental error by allowing the admission of certain testimony. We affirm.

# Facts and Procedural History

[3] Cynthia Robbins married Culler in 2008. In 2009, Cynthia moved to Henry County with Culler and her two daughters, H.R. and Y.R. Cynthia, who was employed as a nurse at IU North Hospital, worked the night shift three nights a week. On nights when Cynthia worked, H.R. would go stay with her

grandmother,[1] and Y.R. would stay in the family home with Culler. At all relevant times, Culler was "at least fifty-some years old." Tr. p. 82.

[4] At some point around Christmas of 2009, when Y.R. was in fourth grade,[2] Culler began touching Y.R. inappropriately. The first occasion occurred one evening when Cynthia and H.R. were not home. On this evening, Culler and Y.R. were together on a couch watching the movie "Tom and Jerry." Tr. p. 20. At the time, Culler was sitting up and Y.R. was lying with her head placed on Culler's leg. Both Y.R. and Culler were wearing pajamas, with Culler wearing a pair of red pajama pants "that opened up at the crotch area." Tr. p. 21. At some point while Culler and Y.R. were watching the movie, Culler "put his hand down [Y.R.'s] pants." Tr. p. 20. Culler touched Y.R.'s skin underneath both her clothing and her undergarments. Culler also placed his hand on Y.R.'s vagina. Culler asked Y.R. "if it was okay and [Y.R.] said, sure, because [she] was really scared and because [her] mom and [Culler] had been fighting a lot and he'd been cornering [Cynthia] and he [had] even cornered [Y.R.] a few times." Tr. p. 20. Culler left his hand touching Y.R.'s vagina "until the end of the movie." Tr. p. 21.

---

[1] Cynthia testified that although Culler was civil and nice to Y.R., he treated H.R., who was older than Y.R., "differently." Tr. p. 82. Culler would turn his back on H.R., make fun of H.R., and "put her down." Tr. p. 83. Ultimately, Culler made H.R. "feel very unwelcome in her home." Tr. p. 83.

[2] Y.R. was born on February 26, 2000, and was nine years old in the latter part of 2009.

[5] The inappropriate touching occurred a number of times while Y.R. was still in fourth grade. On these occasions, Culler would approach Y.R. and ask her to watch a movie after Cynthia left for work and H.R. left to stay with her grandmother. Culler would sit near Y.R. and spread a blanket over both himself and Y.R. At some point during the movie, Culler would begin touching Y.R. inappropriately, touching her breasts, buttocks, and vagina. Culler would touch Y.R.'s breasts and vagina underneath her clothing but would touch her buttocks over her clothing. When touching Y.R.'s breasts, Culler "would squeeze them" and would "pinch [her] nipples." Tr. p. 25. Culler would also "rub" Y.R.'s buttocks and vagina. Tr. p. 25. While Culler would use his right hand to touch Y.R., he would use his left hand to masturbate. When Culler finished touching Y.R., he would "either let out a sigh or he'd say something likem [sic] oh, my, or something like that." Tr. p. 27. The inappropriate touching continued about once a week until the summer of 2010 when Cynthia and H.R. were "home more" and there were "more people around." Tr. p. 28.

[6] Culler again began touching Y.R. inappropriately in the fall of 2010 when Y.R. started fifth grade. The manner of these touchings was the same as had occurred during the 2009-2010 school year. As had occurred the year before, the inappropriate touching continued until late spring/early summer of 2011. Culler did not touch Y.R. inappropriately during Y.R.'s sixth grade year, *i.e.*, the 2011-2012 school year, because Y.R. would hide in her bedroom.

[7] When Y.R. was in either fifth or sixth grade, Culler began coming into Y.R.'s bedroom in the morning while Y.R. was getting dressed. On at least one occasion, Culler told Y.R. "that [her] boobs were cute." Tr. p. 30. Y.R. complained to her mother about Culler's actions on numerous occasions asking her mother "if it was right for a dad to come in while their daughters are dressing." Tr. p. 29. After Y.R. complained, Cynthia told Culler "several times to stop." Tr. p. 29.

[8] In approximately March of Y.R.'s seventh grade year, Cynthia and H.R. went on a mission trip to Mexico. Cynthia and H.R. were gone for "probably a week or two" on this trip. Tr. p. 31. On Sunday while Cynthia and H.R. were on the trip, Y.R. and Culler went to church. After arriving home from church, Culler asked Y.R. if she wanted to watch a movie. Y.R. agreed to watch a movie "[b]ecause [the inappropriate touchings] hadn't happened for so long, [Y.R.] thought that [Culler] understood that [she] didn't want that and that he shouldn't be doing that." Tr. p. 31. Y.R., who was still wearing the skirt that she had worn to church, covered up with a blanket and "was laying on [her] side" on the couch when Culler approached and sat down next to her. Tr. p. 31. Culler then "put his hand underneath the blanket and [Y.R.'s] skirt and he put his fingers inside of [her] vagina and he was moving them around." Tr. p. 31. After Culler penetrated her vagina with his fingers, Y.R. became "scared." Tr. p. 32. Y.R. "waited until the end of the movie and then [she] went in [her] room and [she] didn't come back out the rest of the day." Tr. p. 32.

[9] Although she did not remember the exact days, Y.R. maintains that Culler penetrated her vagina with his fingers on other occasions. After the initial penetration, Culler's pattern of touching Y.R., which had remained similar to that employed by Culler when Y.R. was younger, would include penetration of Y.R.'s vagina. Y.R. remembers that Culler penetrated her vagina with his fingers in both the spring and fall of 2013 and in either January or February of 2014. Y.R. was thirteen when the abuse occurred during the spring and fall of 2013 and thirteen or fourteen when the abuse occurred in the early months of 2014. The day or so after touching Y.R. inappropriately, Culler would "tell [Y.R.] that it was [their] secret and that [she] wasn't supposed to tell, [she was] not supposed to tell anyone about it." Tr. p. 33.

[10] While this abuse was ongoing, Y.R. often felt threatened by Culler who would pin her in a corner against the kitchen counter with his body and "put his crotch against" Y.R.'s crotch. Tr. p. 33. Culler also indicated in front of Y.R. that "he used to be a sharp shooter" and showed Y.R. where he kept "all the guns." Tr. p. 34. Although Culler "only ever showed [Y.R.] the guns once, … multiple times a week he would say that he used to be a sharp shooter, about how great he is at shooting." Tr. p. 35. Culler's apparent shooting ability caused Y.R. concern.

[11] On the morning of February 18, 2014, Culler "came down the stairs very quickly[,]" approached Y.R.'s bedroom, opened her bedroom door, and started yelling at her. Tr. p. 17. Culler indicated that he had not been able to get to sleep because Y.R. had left her radio on all night at a volume level which he

thought was "too loud." Tr. p. 17. When Y.R. indicated that she had "slept fine" and that she thought the volume level was "low enough[,]" Culler slapped Y.R. on the cheek and called her a brat. Tr. p. 17. A short time later, Y.R. left the residence and went to school.

[12] Once she got to school, Y.R. told her friend about her encounter earlier that morning. Y.R. also confided in her friend that Culler "had been molesting" her. Tr. p. 17. Y.R. indicated that she "didn't know what to do, so [she and her friend] went to a teacher who taught us about abuse and so [sic] she took us to the principal and I told him." Tr. p. 17. The principal then informed police.

[13] Later that same day, Henry County Sheriff's Detective Stacey Guffey spoke with Y.R. at the school. After Y.R. gave an initial statement, Detective Guffey determined it was necessary to obtain a recorded statement. Detective Guffey transported Y.R. to the Henry County Sheriff's Department and obtained a recorded statement from Y.R. At some point, Detective Guffey observed that Y.R. was having difficulty discussing the sensitive subject matter. Detective Guffey explained that Y.R. requested that a female be present, and Detective Guffey complied with this request in an attempt to make Y.R. feel more comfortable. Y.R. informed Detective Guffey that Culler "had touched her breasts, her buttocks and her vagina." Tr. p. 107. Y.R. indicated that when Culler would be touching her, "he would also be touching himself, his penis, and masturbating." Tr. p. 107. Y.R. further indicated that the touching would continue until Culler ejaculated and that she knew when Culler had ejaculated because "after he was done, she said he would kind of have a real heavy sigh"

of relief. Tr. p. 107. Y.R. gave a subsequent, more detailed statement, to Detective Guffey in November of 2014.

[14] On March 28, 2016, Appellee-Plaintiff the State of Indiana ("the State") charged Culler with three counts of Class A felony child molesting, one count of Class C felony child molesting, three counts of Class D felony vicarious sexual gratification, and one count of Class B misdemeanor battery. The case proceeded to a jury trial on September 27 through 29, 2016.

[15] During trial, Y.R. detailed Culler's actions towards her and indicated that she did not report Culler's actions sooner because she "felt like [she] was trying to protect [her] family by keeping him from getting angry with them." Tr. p. 35. Y.R. indicated she was concerned about Culler's apparent shooting ability given the number of guns hidden throughout the family home. Y.R. further indicated that she had observed Culler display violent tendencies when angry. Specifically, Y.R. had observed Culler corner her mother upstairs and attempt "to smack her." Tr. p. 35. Y.R. also indicated that when Culler became angry with her, he would throw things, call her names, or kick her.

[16] On cross-examination, Y.R. indicated that she did not join her sister at her grandmother's house because Culler "would pretty much throw a temper tantrum." Tr. p. 37. Culler would "complain to [Y.R.'s] mom that [she] didn't want to spend time with [him,]" would try to get Y.R. into trouble, and would "get really agitated." Tr. p. 37. Y.R. indicated that Culler "was calmer" if she did not go to her grandmother's house. Y.R. further indicated that she did not

get up and leave during an incident of inappropriate touching because "if [she] had just left and … if [she] had just locked [her] door, [she] would get in trouble for it later because [Culler] would tell [her] mom that [she] was being disrespectful" and she "would get in trouble for it." Tr. p. 38. Y.R. also indicated that her mother would encourage her to spend family time with Culler "because she didn't know what was going on. She didn't know why I didn't want to spend time with him." Tr. p. 53.

[17] Y.R. admitted that before she reported the abuse, she was "sad because [she] didn't know how to get out of [her] situation." Tr. p. 50. Upon reporting the abuse, Y.R. felt ashamed, scared, and "[i]mmensely" nervous. Tr. p. 56. Y.R. explained that the statement that she initially gave Detective Guffey on February 18, 2014, was not as detailed as her subsequent statement because she "wasn't very focused that day. Being as nervous as I was, I was jittery and babbling. I didn't know how to explain everything, but once I had more time to think about it and remember things, I was able to give more information." Tr. p. 56.

[18] Following the conclusion of the evidence, the jury found Culler guilty of three counts of Class A felony child molesting, one count of Class C felony child molesting, and three counts of Class D felony vicarious sexual gratification. The jury found Culler not guilty of the class B misdemeanor battery charge. On October 25, 2016, the trial court sentenced Culler to an aggregate term of 110 years, with 108 executed in the DOC and two years suspended to probation. This appeal follows.

# Discussion and Decision

Culler contends that the evidence is insufficient to sustain two of his three convictions for Class A felony child molesting. Culler also contends that the trial court committed fundamental error by allowing alleged vouching testimony.

## I. Sufficiency of the Evidence

Culler contends that the evidence is insufficient to sustain two of his three convictions for Class A felony child molesting.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in

original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

[21] In order to convict Culler of Class A felony child molesting, the State was required to prove that Culler, a person at least twenty-one years of age, did knowingly perform deviate sexual conduct with Y.R., a child under fourteen years of age. Ind. Code § 35-42-4-3(a)(1). At the time Culler committed the instant offenses, "deviate sexual conduct" was defined as follows: "'Deviate sexual conduct' means an act involving: (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-31.5-2-94. We have previously concluded that "a finger is an object for purposes of deviate sexual conduct under the child molesting statute." *Hurley v. State*, 560 N.E.2d 67, 69 (Ind. Ct. App. 1990).

[22] In challenging the sufficiency of the evidence, Culler claims that the State only presented evidence of one penetration of Y.R.'s vagina, and, as such, only presented sufficient evidence to sustain one of his three convictions for Class A felony child molesting. We are unpersuaded by Culler's claim in this regard, however, because the record explicitly contains evidence that Culler penetrated Y.R.'s vagina with his finger on at least three separate occasions. Y.R. specifically testified that Culler penetrated her vagina with his finger in March of 2013, in the fall of 2013, and in January or February of 2014. The record

additionally demonstrates that during the relevant time periods, Y.R. was thirteen years old.

[23] Y.R.'s testimony is sufficient to sustain Culler's convictions. *See Carter v. State*, 754 N.E.2d 877, 880 (Ind. 2001) (providing that "[a] molested child's uncorroborated testimony is sufficient to sustain a conviction"). Furthermore, it is well-established that the jury, acting as the trier-of-fact, was free to believe or disbelieve Y.R.'s testimony regarding the number of times Culler penetrated her vagina with his fingers and to weigh said testimony accordingly. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *McClendon v. State*, 671 N.E.2d 486, 488 (Ind. Ct. App. 1996); *Moore v. State*, 637 N.E.2d 816, 822 (Ind. Ct. App. 1994), *trans. denied*. Given Y.R.'s testimony that Culler penetrated her vagina with his finger on at least three separate occasions, we conclude that the evidence is sufficient to sustain all three of Culler's convictions for Class A felony child molestation. Culler's claim to the contrary effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See Stewart*, 768 N.E.2d at 435.

## II. Admission of Alleged Vouching Testimony

[24] Culler also contends that the trial court erred in admitting certain testimony which he claims constituted impermissible vouching testimony. Specifically, Culler contends that the trial court erred in admitting certain statements made by Cynthia and Detective Guffey. "The decision to admit or exclude evidence at trial is squarely within a trial court's discretion and we afford it great

deference on appeal." *VanPatten v. State*, 986 N.E.2d 255, 260 (Ind. 2013) (citing *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind. 2003)). "We will not reverse such a decision, often made in the context of heated testimony and argument, unless it is clearly contrary to the logic and effect of the facts and circumstances of the case or misinterprets the law." *Id.* (citing *Carpenter*, 786 N.E.2d at 703).

[25]   In arguing that the trial court erred in admitting the challenged testimony, Culler acknowledges that because he did not object to the admission of the challenged evidence at trial, he must prove on appeal that the admission of the challenged evidence amounted to fundamental error. "Failure to object at trial waives the issue for review unless fundamental error occurred." *Treadway v. State*, 924 N.E.2d 621, 633 (Ind. 2010).

> The fundamental error doctrine provides a vehicle for the review of error not properly preserved for appeal. In order to be fundamental, the error must represent a blatant violation of basic principles rendering the trial unfair to the defendant and thereby depriving the defendant of fundamental due process. *Pope v. State*, 737 N.E.2d 374, 380 (Ind. 2000). The error must be so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* In considering whether a claimed error denied the defendant a fair trial, we determine whether the resulting harm or potential for harm is substantial. *Id.* Harm is not shown by the fact that the defendant was ultimately convicted. *Id.* Rather, harm is determined by whether the defendant's right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he would have been entitled. *Id.*

*Baker v. State*, 948 N.E.2d 1169, 1178-79 (Ind. 2011). The fundamental error exception is extremely narrow and is available only in "'egregious circumstances.'" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1608 (Ind. 2003)).

## A. Cynthia's Testimony

Culler argues that the trial court committed fundamental error by allowing Cynthia to vouch for Y.R.'s credibility. The portion of Cynthia's testimony at issue reads as follows:

> Q     When you first heard Detective Guffey tell you about the allegations, did you believe them?
>
> A     As a nurse of twenty-seven years, hearing these painful allegations, my first response with the grieving process was my life was shattered and I was in denial. It was very painful.
>
> Q     Did, at first, you tell Detective Guffey that you thought "Y.R." might be making these up?
>
> A     It was hard. Yes.
>
> Q     So you did, in fact, tell Detective Guffey that you were unsure if she was being honest with him.
>
> A     Yes.
>
> Q     Okay, and then after you met with Detective Guffey, did you talk to your daughter, "Y.R."?
>
> A     I went to work that night because I needed some time to think and I sent "Y.R." home with her grandmother to separate

the situation until I could have time to figure it out and then I came home the next morning from work and I told [Culler] I had to go talk to "Y.R.". I had to go talk to her. I love my daughter. I had to go hear her side, too.

Q       And you listened to what she had to say.

A       Yes, I did.

Q       And at that point, did you believe her or not?

A       Yes, I believed her because of a very specific incident she told me about.

Q       And what was that incident?

A       I believe, I am very private with my sexual life. I close the doors and would never do anything around my children. When my husband, when he usually touched me, touched my breasts or whatever and he touched himself and ejaculated, he would always go ahhhhh. She described that to me, detail by detail. She knew every detail and there is no way, no way, she could have known those details if it had not happened to her.

Tr. pp. 89-90.

[27]    A parent's statement that they believed their child has been found to constitute impermissible vouching. *See Bean v. State*, 15 N.E.3d 12, 18 (Ind. Ct. App. 2014) (citing *Hoglund v. State*, 962 N.E.2d 1230, 1238 (Ind. 2012)). However, error in admitting this type of vouching testimony "is harmless 'if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence

contributed to the conviction.'" *Wilkes v. State*, 7 N.E.3d 402, 406 (Ind. Ct. App. 2014) (quoting *Hoglund*, 962 N.E.2d at 1238).

[28] In this case, although it was error for the trial court to allow Cynthia to testify that she believed Y.R., we cannot say that the admission of such testimony amounted to fundamental error. In the challenged portion of Cynthia's testimony, Cynthia admitted that although she initially doubted whether Y.R. was telling the truth, she eventually came to believe that Y.R. was telling the truth because Y.R. accurately detailed the specific way that Culler expressed himself when ejaculating and that there is no way that Y.R. could have done so if she had not experienced for herself. Cynthia's testimony came after Y.R. had testified in detail about the abuse Culler subjected her to.

[29] Given the detailed and consistent nature of Y.R.'s testimony, we cannot say that the briefly vouching portion of Cynthia's testimony rose to the level where it would affect the fairness or integrity of the judicial proceedings or deny Culler due process. *See Kelley v. State*, 566 N.E.2d 591, 593 (Ind. Ct. App. 1991) (providing that a therapist's brief statement that the therapist believed the child victim was telling the truth did not amount to fundament error because it did not rise to the level where it would affect the fairness or integrity of the judicial proceedings or deny the defendant due process). As such, any error in admitting such testimony was harmless. *See Hoglund*, 962 N.E.2d at 1240 (finding no fundamental error in admission of vouching testimony from multiple witnesses given the substantial independent evidence of defendant's guilt). Culler, therefore, has failed to demonstrate that any error committed by

the trial court with respect to Cynthia's testimony amounted to fundamental error.

## B. Detective Guffey's Testimony

[30] Culler also argues that the trial court committed fundamental error by allowing Detective Guffey to vouch for Y.R.'s credibility. The portion of Detective Guffey's testimony at issue reads as follows:

> Q       Okay, and when you are interviewing somebody, what are the tools you use in trying to determine whether somebody is being honest with you or not?
>
> A       You know, some I [sic] rely on is body language and I, personally, I'll ask the same type of question, but I'll ask it, you know, different times in different ways to see if I'm actually getting all the truth and all the information.
>
> Q       And was this a technique that you were trained in or learned over time?
>
> A       Yes, sir.
>
> Q       And in those interview[s] with "Y.R.", did you do that?
>
> A       Yes, sir, I did.
>
> Q       Okay, and did she ever answer any questions inconsistently?
>
> A       Not that I can recall. I think everything was pretty well consistent, especially the initial interview, from the first time to the last time, the last interview.

Tr. p. 110.

[31] We have previously found a detective's testimony that the victim's reports to be consistent and that he told the defendant that he did not see a reason why the victim would "would come out and lie about this stuff" to be indirect vouching testimony. *Wilkes*, 7 N.E.3d at 402. However, as we noted above, error in admitting vouching testimony "is harmless 'if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court there is no substantial likelihood the challenged evidence contributed to the conviction.'" *Wilkes*, 7 N.E.3d at 406 (quoting *Hoglund*, 962 N.E.2d at 1238).

[32] Just as was the case with regard to Cynthia's testimony, given the detailed and consistent nature of Y.R.'s testimony, we cannot say that the briefly vouching portion of Detective Guffey's testimony rose to the level where it would affect the fairness or integrity of the judicial proceedings or deny Culler due process. *See Kelley*, 566 N.E.2d at 593 (providing that a therapist's brief statement that the therapist believed the child victim was telling the truth did not amount to fundament error because it did not rise to the level where it would affect the fairness or integrity of the judicial proceedings or deny the defendant due process). As such, any error in admitting such testimony was harmless. *See Hoglund*, 962 N.E.2d at 1240 (finding no fundamental error in admission of vouching testimony from multiple witnesses given the substantial independent evidence of defendant's guilt). Culler, therefore, has failed to demonstrate that any error committed by the trial court with respect to Detective Guffey's testimony amounted to fundamental error.

# Conclusion

[33] In sum, we conclude that (1) the evidence is sufficient to sustain all three of Culler's convictions for Class A felony child molesting and (2) any error in admitting the challenged evidence did not amount to fundamental error. Accordingly, we affirm the judgment of the trial court.

[34] The judgment of the trial court is affirmed.

Bailey, J., and Robb, J., concur.